*In re* AMB

Docket No. 218869. Submitted March 5, 2001, at Detroit. Decided November 6, 2001, at 9:00 A.M.

The Family Independence Agency (FIA) filed a petition in the Juvenile Section of the Family Division of the Wayne Circuit Court, seeking that the court take temporary custody of two-day-old AMB, who had been born five months premature with severe medical, physical, and brain abnormalities. The petition alleged that the family court had jurisdiction because AMB's mother, KB, had mental limitations that made her unable to make decisions concerning AMB's medical care and that AMB's alleged father, JB, was KB's father and was the subject of a pending petition to terminate his parental rights in KB by reason of sexual abuse. A preliminary hearing regarding the petition was held before a referee of the family court. Neither KB nor JB attended the hearing, and neither was represented by counsel, although AMB was represented by attorney William Ladd, who appeared pursuant to an order appointing the Legal Aid and Defender Association to represent AMB's interests. No one testified under oath, but an FIA caseworker informed the referee that she had told KB, but not JB, about the hearing. The referee found that reasonable efforts had been made to notify the parties and there was probable cause to authorize the agency's requested placement order and to authorize all necessary medical treatment of AMB. Four days later the FIA filed an amended petition that was nearly identical to the initial petition but that further alleged that AMB was being kept alive by life support procedures and was experiencing physical distress with no hope of surviving independent of the life support and that it was not in the child's best interests to be maintained on life support. A hearing regarding the amended petition was held before a different referee. Neither KB nor JB appeared at the second hearing, and neither was represented by counsel. Attorney Ladd did not appear at the second hearing because he had not been notified that the hearing had been scheduled. In Ladd's stead, "emergency house counsel" Paula Mahinske appeared to represent AMB's interests. AMB's neonatologist testified concerning the child's multiple and severe medical problems, opined that she could not be sure how long AMB might survive without life support but that long-term survival was not

likely, indicated that AMB would suffer less if the life support measures were ended, and opined that sustaining AMB's life with medical technology would intensify AMB's suffering while failing to offer any solution for the dire health problems. An FIA caseworker testified concerning KB's limited intelligence and opined that it would be virtually impossible for KB to make an informed judgment concerning AMB's care. The attorney for the FIA asked that the court authorize Children's Hospital of Michigan, where AMB was being treated, to make an appropriate decision concerning the removal of life support on the basis of the best interests of AMB. Attorney Mahinske concurred in that recommendation. The referee's report, after summarizing the evidence, concluded that the court should authorize the hospital to take AMB off life support, but that care must be taken to make AMB comfortable. The referee completed a preprinted dispositional order form that authorized Children's Hospital to take AMB off life support; however, the form indicated that the order "is effective 7 days after the hearing date" unless a petition for review was filed. The referee's report was stamped by the court, Kirsten Frank Kelly, J., with a date stamp for the third day after the hearing, indicating that the recommendations and findings had been examined and approved. A similar stamped signature of the court and date stamp were placed on the proposed order. On the following day, the fourth day after the hearing, the staff of Children's Hospital removed the life support, and AMB died. Six days later, Ladd filed a petition for judicial review of the referee's findings and recommendation. The family court, Kirsten Frank Kelly, J., approved the referee's findings and recommendation and dismissed Ladd's petition as moot. Ladd and another attorney each filed a claim of appeal in the Court of Appeals on behalf of AMB. The Court of Appeals dismissed the appeals on the ground that neither attorney had the authority to file an appeal on behalf of AMB. Ladd then sought leave to appeal to the Supreme Court, which, in lieu of granting leave to appeal, vacated the order of the Court of Appeals dismissing the appeal and remanded the matter to the Court of Appeals for consideration on the merits of certain specified issues that attorney Ladd had raised. 462 Mich 882 (2000).

On remand, the Court of Appeals *held*:

1. In a child protective proceeding, the subject-matter jurisdiction of a family court depends solely on whether the petition filed by a child protective agency alleges facts that fit within the requirements of MCL 712A.2(b) and are not merely frivolous. A family court does not lose subject-matter jurisdiction in a protective proceeding solely because a decision involving a serious medical con-

dition must be made, including a decision whether to withdraw life support.

2. MCL 712A.18f(4) describes the process by which a family court may enter a dispositional order that provides for appropriate care for a child. An order may be entered by a family court under that provision only after the court has properly determined that the child comes within the court's jurisdiction pursuant to MCL 712A.2(b). MCL 722.124a authorizes a family court to enter an order allowing medical personnel to withdraw life support from a minor child that has been placed in out-of-home care if the medical or surgical care being given ceases to be treatment. However, the family court must make every possible effort to hold an adjudication before authorizing the withdrawal of life support.

3. Neither the federal Child Abuse Prevention and Treatment and Adoption Reform Act, 42 USC 5101 *et seq.*, nor the federal Emergency Medical Treatment and Active Labor Act, 42 USC 1395dd, specifically prohibits a family court from considering whether to withdraw life support.

4. Although discrimination in judicial proceedings may give rise to a due process or an equal protection argument that may be asserted on appeal, neither the federal Americans with Disabilities Act, 42 USC 12101 *et seq.*, nor the state Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.*, may be used to challenge on appeal a family court's decision concerning the withdrawal of life support where neither act was at issue in the family court.

5. In considering whether to withdraw life support, a family court must first determine whether a minor child is of an age and maturity to make a decision concerning treatment. If the court determines that the child is or was competent to decide to refuse treatment and that the child expresses, or previously expressed while competent, an intent to refuse treatment, the court must enforce that choice. If the child was never competent to make such a decision or expressed no intent with respect to the question of refusal of treatment, the court must determine whether the termination of treatment is in the child's best interests.

6. Although MCL 712A.10 permits a referee to conduct a hearing relevant to withdrawal of life support, the referee must make findings of fact and recommendations that are submitted to a judge. Even if there is no request for judicial review of the referee's findings and recommendations, a judge must, in fact and not merely in form, make the decision to authorize the withdrawal of life support and must personally sign any order authorizing the withdrawal of life support.

7. Throughout a proceeding brought under the Juvenile Code and involving the question of termination of life support of a child, the child has the right to an attorney who is a zealous advocate of the child's interests.

8. The record demonstrates that in this case the procedures as implemented allowed the hearings to proceed without adequate and proper notice to the interested parties, allowed the matter to proceed to a dispositional proceeding without adequate inquiry into whether the court had proper jurisdiction of the matter, denied the child adequate representation by counsel, and permitted the referee's findings and recommendation to be reduced to an order of the court without the court having, in fact rather then merely in form, made an independent decision concerning the propriety of issuing an order authorizing the termination of life support.

Reversed.

1. COURTS — FAMILY COURTS — CHILD PROTECTIVE PROCEEDINGS — JURISDICTION.

The subject-matter jurisdiction of a family court in child protective matters depends solely on whether the petition filed by a child protective agency alleges facts that fit within the statutory requirements and are not merely frivolous; a family court does not lose subject-matter jurisdiction in a protective proceeding solely because a decision involving a serious medical condition must be made, including a decision whether to withdraw life support (MCL 712A.2[b]).

2. COURTS — FAMILY COURTS — CHILD PROTECTIVE PROCEEDINGS — DISPOSITIONAL ORDERS — APPROPRIATE CARE.

A family court may enter a dispositional order regarding the appropriate care that should be given a child, including a decision to allow medical personnel to terminate life support; however, such a dispositional order may be entered by a family court only after the court has properly determined that the child comes within the court's jurisdiction (MCL 712A.2[b], 712A.18f[4]).

3. COURTS — FAMILY COURTS — CHILD PROTECTIVE PROCEEDINGS — WITHDRAWAL OF LIFE SUPPORT — OUT-OF-HOME CARE.

A family court may enter an order allowing medical personnel to withdraw life support from a minor child that the court has placed in out-of-home care if the medical or surgical care being given to the child ceases to be treatment; however, a family court must make every possible effort to hold an adjudication before authorizing the withdrawal of life support (MCL 722.124a).

4. Courts — Family Courts — Child Protective Proceedings — Withdrawal of Life Support — Emergency Medical Treatment and Active Labor Act — Child Abuse Prevention and Treatment and Adoption Reform Act.

Neither the federal Emergency Medical Treatment and Active Labor Act nor the federal Child Abuse Prevention and Treatment and Adoption Reform Act specifically prohibits a family court from considering whether to withdraw life support from a child that is under the court's jurisdiction (42 USC 1395dd, 5101 *et seq.*).

5. Courts — Family Courts — Child Protective Proceedings — Withdrawal of Life Support — Referees.

A family court referee may conduct a hearing relevant to the withdrawal of life support of a child that is subject to the family court's jurisdiction; the referee must make findings of fact and recommendations that are submitted to a judge of the family court; even if there is no request for judicial review of the referee's findings and recommendations, a judge must, in fact and not merely in form, make the decision to authorize the withdrawal of life support and must personally sign any order authorizing the withdrawal of life support (MCL 712A.10).

6. Courts — Family Courts — Child Protective Proceedings — Withdrawal of Life Support — Effective Assistance of Counsel.

A child who is the subject of a petition in a family court seeking the court's authorization to terminate life support procedures on the child has the right to an attorney who is a zealous advocate of the child's interests (MCL 712A.13a[1][b], 712A.17c[7], 712A.17d).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *Judy Hartsfield*, Assistant In Charge, and *Larry W. Lewis*, Assistant Attorney General, for the Family Independence Agency.

*William E. Ladd*, for AMB.

Amici Curiae:

*Mary J. Bomgren, Calvin A. Luker*, and *Kathleen N. Harris*, for Michigan Protection and Advocacy Service, Inc.

Judith Andre, Howard Brody, Leonard M. Fleck, Thomas Tomlinson, and Clayton L. Thomason, in propria persona, as scholars in medical ethics.

*Frank E. Vandervoort, Charlotte L. Allen,* and *Evelyn Tombers,* for the Children's Law Section of the State Bar of Michigan.

*Anne Argiroff* and *Ann Routt,* for The American Civil Liberties Union and Legal Services of Southern Michigan.

Before: WHITBECK, P.J., and MCDONALD and COLLINS, JJ.

WHITBECK, P.J. Apparently relying on an "order" entered by a family court referee, medical personnel at Children's Hospital of Michigan withdrew life-sustaining medical treatment that AMB, an infant, was receiving. She died soon thereafter. William Ladd, the attorney appointed to represent her in the protective proceeding that originally brought her situation before the family court, appeals on her behalf. We reverse.

### I. INTRODUCTION

This case is, at its core, a human tragedy. AMB, whom we call baby Allison, is the central figure. She was born severely ill, with a poor prognosis for long-term survival, and required extensive medical care. This care included immediate ventilator support and intravenous drug therapy in the neonatal intensive care unit at Children's Hospital of Michigan, in Detroit. Baby Allison died at Children's Hospital just ten days later.

Baby Allison's short life, while heartbreaking in itself, does not hint at the truly appalling circumstances relating to her conception and death. At age seventeen, baby Allison's mother, KB, became pregnant. Baby Allison's putative father, JB, was also KB's father. When this situation came to light, local authorities pressed criminal charges against JB and instituted a protective proceeding against JB and his wife to terminate their parental rights to KB and KB's younger brother. To complicate this situation further, the record includes explicit, though unproven, allegations that KB is mentally retarded or has some form of developmental delay. The resolutions of the criminal case against JB and the separate child protective proceeding against JB and his wife are not evident from the available record. However, it is possible to infer that JB raped his mentally disabled daughter, KB, leading to baby Allison's incestuous conception.

If the facts surrounding baby Allison's conception are tragic, the circumstances leading to her death are doubly so. Through unredeemably flawed family court proceedings, the Family Independence Agency (FIA) acquired what appeared to be an order that authorized Children's Hospital staff "to take the child off life support equipment and medication provided that 'Comfort Care' is provided." Despite an explicit warning that the order did not take effect for seven days, the very next day Children's Hospital staff contacted a chaplain who baptized baby Allison while her mother and her three aunts were present. According to the chaplain's notes, at approximately 7:30 P.M. "[a]fter the baptism the aunts decided to have the child removed from life support. Both I [the chaplain] and Michelle the charge nurse took pictures. I again

prayed for the baby and the family. The infant was pronounced dead at 9:25 P.M." Thus, Children's Hospital staff removed baby Allison from life support without any legal authority, even under the terms of an order that we ultimately conclude had no legal basis whatsoever. Nonetheless, baby Allison's life ended, the final act of this tragedy of almost mythical proportions.

The series of individual legal errors and missteps that led to baby Allison's death are our only focus in this appeal. The hasty family court proceedings were so unseemly precisely because those involved in this decision knew that a life hung in the balance. The unforeseen consequence of this rush to make a decision is that the record consists mostly of allegations, unsworn statements, and hearsay. More often than not, this has forced us to assume that the record is both adequate and accurate simply to reach the legal issues. We emphasize, however, that there is no way to determine the truth about this case with any assurance. Further, these proceedings occurred less than one month before significant changes to the Juvenile Code went into effect on March 1, 1999.[1] Perhaps, had baby Allison been born just a few weeks later, these proceedings would have been conducted differently.

## II. ALLEGED FACTS AND PROCEDURAL HISTORY

### A. BABY ALLISON'S BIRTH

KB gave birth to baby Allison five weeks prematurely, on February 9, 1999, at Oakwood Hospital. Physicians then discovered that baby Allison's heart

---

[1] See 1998 PA 480.

was missing a septum, two of her heart valves were deformed, her aorta was very small, and the size of her heart had forced her left lung to collapse partially. Baby Allison had hydrocephaly and other brain abnormalities suggesting corpus callosum agenesis, as well as malformed hip joints and a possible problem with her intestines. Physicians used the drug prostaglandin to open baby Allison's ductus arteriosis to help circulate oxygenated blood through her body and placed her on a ventilator. Within hours of her birth, Oakwood Hospital staff transferred baby Allison to the neonatal intensive care unit at the Children's Hospital of Michigan in Detroit.

### B. THE FIRST HEARING

On February 11, 1999, FIA caseworker Judith Matlock filed an original petition alleging that baby Allison came within the family court's jurisdiction pursuant to MCL 712A.2(b)(1) or (2). The factual allegations in the petition focused on three circumstances: the sexual abuse in the home JB and his wife shared and the pending petition to terminate their parental rights, KB's alleged mental limitations and her alleged inability to make decisions for critically ill baby Allison, and KB's informal living arrangements with her uncle and aunt. The petition asked the family court to take temporary custody of baby Allison, noting that KB had not made any plans to care for her baby because KB neither knew how to care for an infant nor had any money.

Richard Smart, a referee in the family court, held a preliminary hearing regarding the petition that same day. Neither KB nor JB attended this first hearing, and neither was represented by counsel. No one,

including Matlock, testified under oath. However, Matlock informed referee Smart that she told KB, but not JB, about the hearing. Referee Smart went off the record briefly before finding "that reasonable efforts have been made to notify the respondent, all parties." The attorney for the FIA asked referee Smart to authorize the petition and a placement order and to "authorize all necessary medical treatment for this child, who is hydrocephalic and has heart defects." Without hearing any additional argument, referee Smart found probable cause to authorize the petition.

After a second discussion off the record, baby Allison's attorney, Ladd, objected to an order authorizing anything other than routine medical care, stating, "[T]he statute [does not allow] anything more than routine medical care and anything that's not along those lines . . . . I believe the mother is also subject to a petition in this court. [B]ut she is eighteen. If she's capable of . . . consenting, she can consent . . . ." Referee Smart then suggested that KB was incapable of consenting to medical treatment for baby Allison, to which Ladd replied, "Well, then I think that the agency, if there's any . . . nonroutine medical care, they're going to have to ask for consent of the Court." Ladd gave several examples of what he considered nonroutine care, including brain surgery or a heart transplant. The assistant attorney general representing the FIA interjected that he believed that it was within the family court's authority to authorize all necessary care without specification. Referee Smart stated that his decision would be to "enter an order allowing for the child to have all necessary medical treatment." Ladd responded, "The [FIA] worker tells me that there's a serious question about the nature or

extent of efforts . . . the hospital will use to maintain this child alive. And I don't think that you should enter a blanket order [for medical care] under those circumstances." When referee Smart said that he was not sure what Ladd was saying, Ladd replied:

Well, if you enter a blanket order, you're essentially giving the FIA and/or the hospital the discretion to determine what's necessary medical care. And while they may do things that are unusual and . . . that would normally require some consent, that order could also authorize them to interpret that as meaning that they could not give that care. And I think that's not proper.

\*     \*     \*

I think that a fully informed decision about medical care, specific medical care for this child is necessary.

Referee Smart signed and dated a form order authorizing the petition, indicating on the face of the order that he was a hearing referee. The order stated that "[n]otice of hearing was given as required by law," denied JB visitation rights, and directed the FIA to place baby Allison in foster care or with a suitable relative. The order also noted, "The Court orders the child to receive all necessary medical treatment. Any and all necessary medical treatment is to be given to this child to sustain her life."

### C. THE SECOND HEARING

Matlock filed an amended petition on the following Monday, February 15, 1999. The amended petition was largely identical to the original petition, but also alleged:

7. On or about 2/11/99 the FIA petitioner conferred with Dr. Virginia Delaney-Black and social worker Marie Wilmet-Dully about the condition of this newborn. Dr. Delaney-Black advised that the baby is intubated, on a ventilator because her heart is so enlarged it has collapsed her right [sic] lung, that the heart has measurable and serious defects, including an anomaly of the arch of the aorta, a lack of a partition between the right and left chambers ascites [accumulation of fluid in the peritoneal cavity, causing abdominal sweeling [sic] due to advanced heart failure. The infant is also hydrocephalic. She is being kept alive on life support systems and is experiencing [unreadable] physical distress with no hope of surviving independent of the life support.

8. On or about 2/11/99 Dr. Delaney-Black advised that it was her opinion that it is not in this infant's best interest to [be] maintained on life support.

9. The mother is not capable of comprehending the implications of the medical facts related to the baby and, therefore, cannot make an informed decision.

10. Because [baby Allison] is a pending ward of the court and because she is not under the jurisdiction or pending jurisdiction of another court, FIA petitioner requests that the court render a decision about what is in the best interest of this infant.

Referee Peter Schummer conducted a hearing regarding the amended petition on Wednesday, February 17, 1999. Neither KB nor JB appeared at this second hearing, and neither was represented by counsel. Ladd did not appear at the second hearing because he had not been notified that it was scheduled. In his stead, "emergency house counsel" Paula Mahinske appeared to represent baby Allison. Mahinske did not indicate on the record what, if any, steps she had taken to prepare to represent baby Allison. Referee Schummer did not ask whether KB or JB received notice of the second hearing. Neither of the two attor-

neys present indicated whether KB or JB were aware that the second hearing was scheduled. Referee Schummer did not inquire whether baby Allison or KB had a guardian or a guardian ad litem.

At the second hearing, baby Allison's neonatologist, Dr. Delaney-Black, testified under oath by telephone concerning the circumstances surrounding baby Allison's birth. Dr. Delaney-Black explained that physicians were administering prostaglandin to baby Allison to

> keep the ductus arteriosis open, which gives oxygenated blood to the baby. In the event of withdrawing this, it is likely that the baby would not oxygenate well and might not be able to sustain life without this medication. In addition, the baby's left lung is also been found to be relatively collapsed because of the exceedingly large cardiac silhouette, which is preventing the lung from expanding, and that's another reason for the baby needing to be on the ventilator.

Dr. Delaney-Black said that baby Allison's right lung was "relatively normal," but "for long-term survival, we do not feel that the [heart] lesions that this baby has are compatible with long-term survival. It is possible that taken off the ventilator and taken off the prostaglandins that the baby could live for hours, to days, to months." Dr. Delaney-Black also noted that blood reflux on the right side of baby Allison's heart would ultimately lead to heart failure. When asked whether baby Allison's chances for survival were better if she remained on the ventilator, Dr. Delaney-Black said:

> No. No. The . . . heart problem is really incompatible with life in a long-term survival situation. Now, as I said, I can't tell you how long she could survive, but long-term survival

is . . . not likely at all . . . . [E]ven if she had no other problems, there is no easy solution to any of her heart problems.

\*        \*        \*

My recommendation is that we stop the prostaglandins and we remove her from the ventilator and provide comfort care. There are other abnormalities as well, which I have not described, but it's really the heart, which is the life threatening abnormality at this point. There is also the potential for [a] life threatening abnormality of the bowel, because the bowel may not be normally developed. . . .

According to Dr. Delaney-Black, medical staff had not been able to determine the extent of baby Allison's intestinal problem because she was on a ventilator, but knew that her "very severe" brain "abnormalities" were not life threatening. Dr. Delaney-Black stated that if baby Allison lived long enough and developed the capacity to walk, she would require extensive orthopedic surgery to correct her hip problems.

Dr. Delaney-Black recommended that baby Allison be given "fluids, heat, warmth, monitoring of her heart rate and vital signs," possibly a feeding tube, and anything else that might be necessary to keep her comfortable. If baby Allison lived for weeks to months after being removed from the ventilator, Dr. Delaney-Black believed that the doctors would have to assess whether she would need gastrointestinal surgery. Though Dr. Delaney-Black had not spoken with KB, she believed that another physician had spoken with her and determined that she had an "extremely limited understanding of what was going on, although she did understand that the baby had significant heart problems."

During the brief cross-examination by Mahinske, Dr. Delaney-Black again emphasized that she did not know how long baby Allison could live, irrespective of whether she remained on a ventilator. Dr. Delaney-Black added that baby Allison could only receive prostaglandin intravenously. According to Dr. Delaney-Black, even if the physicians could maintain an intravenous line, it would expose baby Allison to potentially fatal blood infections[2] and pneumonia and, all the while, her heart would continue to fail. Dr. Delaney-Black believed that baby Allison, who was conscious and not sedated, would suffer less if the life support measures ended and

> [b]ecause we have no medical treatment to offer this . . . child in the long run and I think what [sic: that] care is futile [and] to ask an infant to suffer on a ventilator with a tube in their throat, unable to be fed with I.V.s and not being to easily be held or provided with the kinds of life that one would want, that it is not a humane decision.

In all, it was Dr. Delaney-Black's opinion that sustaining baby Allison with medical technology would intensify her suffering while failing to offer any solution for her dire health problems.

When Matlock testified, this time under oath but by telephone, she explained that she had not had direct contact with KB, despite her representation at the first hearing that she "had the opportunity to inform the mother" of the proceedings. Rather, according to Matlock, she had been speaking with KB's paternal aunt. Matlock explained that she had filed the

---

[2] There is a dispute in the record concerning whether baby Allison had DiGeorge's Syndrome, which would make her particularly suceptible to infection.

amended petition, which she called a "medical authorization petition," because she had learned that KB was a "trainable mentally impaired student" and unable to make complex decisions. Matlock said that KB's teacher, who neither testified nor furnished any documentary evidence concerning KB, had estimated KB's IQ at forty-five to fifty points. From Matlock's perspective, "[i]t would be virtually impossible for her [KB] to make an informed judgement [sic] about her daughter because she's not able to comprehend the medical information given to her by the physicians who are treating her daughter." Further,

> even though [KB] appeared, to all parties involved, to understand that she was to have a baby and did in fact have a baby, she had no ability to prepare for the baby, to anticipate the needs of a baby in terms of equipment, of clothing, of having a home, that kind of thing. [KB] will probably remain in the education system until she's twenty-six years old to maximize her opportunities for training. She will be—but she will probably always need a competent care giver.

Matlock wanted the family court to enter an order permitting Children's Hospital to do what was in baby Allison's "best interests." Mahinske did not question Matlock at all.

Following a discussion off the record on an unknown topic, the assistant attorney general representing the FIA summarized the testimony at the hearing. He then stated that "we are asking the Court to authorize the medical authorization petition, which would allow the hospital, Children's Hospital, to make the appropriate decision based on the best interest for [baby Allison] at this point in time." Mahinske responded:

We'd concur in that recommendation. Clearly it's been shown through Ms. Matlock's testimony that this mother lacks any intellectual capacity to make this decision. And so, therefore, the Court must make the decision for her. . . . [B]ased on the medical testimony, I believe it would be in the best interest to let the doctors decide the course of treatment. Unfortunately, this little baby's heart is just not going to sustain her life and it didn't seem clear from the— in fact, it seemed contrary from the testimony that to keep her on life support would not necessarily make her death less painful or any easier. In fact, it would draw out that process and make it more painful because complications would arise, such as septicemia. The growth of the heart would not be normal. And there is no treatment for this heart defect. The only treatment is a heart transplant, but [baby Allison] is not a candidate. So I would ask the Court to enter the order allowing the hospital to make the necessary decisions.

Referee Schummer then commented:

I will authorize Children's Hospital to remove the child from life support as well as from medication, provided that the child is provided with comfort care as outlined by the doctor. It is clear that the child does not have an opportunity to live and prolonging the child's life would only prolong the child's suffering and the mother is certainly not capable of making any informed decisions as to the procedure and the father is unavailable due to his incarceration. Uh, the fact that he is the father of the mother, as well as the father of the child would lead the Court to believe that he is not qualified to make that kind of decision anyway. So I will authorize the medical . . . procedures as requested and the Court does not retain jurisdiction. That's my decision. Anybody dissatisfied with that has a right to appeal it to a judge of this court within seven days, Court of Appeals within twenty-one days after the order is final.

Referee Schummer's report summarized the evidence and concluded that "[t]he court will authorized [sic]

the hospital to take the child off life support equipment and medication provided that 'Comfort Care' is provided." The front page of the report had a stamp of a family court judge's signature and a stamped date indicating that the recommendations and findings had been "[e]xamined and approved" on February 18, 1999.

A "dispositional order" on a preprinted form was entered in the record the same day. The "order" declared, "NOTE: THIS ORDER IS EFFECTIVE 7 DAYS AFTER THE HEARING DATE UNLESS A PETITION FOR REVIEW IS FILED IN ACCORDANCE WITH MCR 5.991." The family court judge's stamped signature appeared on the form order along with a February 18, 1999, date stamp. Substantively, the "order" only stated, "Children's Hospital is authorized to remove the child from life support equipment and medication provided that 'Comfort Care' is provided."

### D. BABY ALLISON'S DEATH AND THE IMMEDIATE AFTERMATH

For reasons that are unclear from the record, Children's Hospital staff did not wait the seven days for the "order" to become effective or for a party to request judicial review. Rather, on February 19, 1999, Children's Hospital staff removed the life support and baby Allison died.

On February 25, 1999, six days after baby Allison's death, Ladd filed a petition for judicial review of referee Schummer's findings and recommendation. In pertinent part, the petition stated that review was critical because Mahinske had represented baby Allison at the second hearing and "[c]ounsel was not given an opportunity to observe the child, consult

with caretakers and expert witnesses. The appointed attorney was not apprised of the early hearing date, nor was any attorney from LADA [the Legal Aid and Defender Association] asked to be present. Neither parent was notified or served." The family court held a review hearing on March 18, 1999. The family court, ruling in part from the bench, approved referee Schummer's findings and recommendation. Nevertheless, at the conclusion of the review hearing, the family court indicated that court personnel would review the procedures in place in order to determine whether there was a better way to handle similar cases in the future. The family court later issued an order that recapitulated its findings and dismissed the review petition as moot.

### E. APPEAL

Attorney Kathleen Gonzales filed a claim of appeal on behalf of baby Allison in April 1999, after which Ladd also filed an appearance. The FIA contested their authority to claim an appeal. The Chief Judge of this Court, in an unpublished order dated October 1, 1999, dismissed the case on an administrative motion docket on the grounds that Gonzales lacked authority to file the appeal on behalf of baby Allison. In response to a motion for rehearing, on November 24, 1999, a panel of three judges[3] dismissed the appeal for the same reason. On January 18, 2000, the same panel vacated the November 24, 1999, order, but again dismissed the appeal "as there is no indication that either attorney is authorized to act on behalf of the child's estate."

---

[3] Judge WHITBECK was a member of that panel.

Having failed to obtain substantive review in this Court, Ladd then applied for leave to appeal to the Michigan Supreme Court. In lieu of granting leave, the Supreme Court reversed this Court's October 1, 1999, order dismissing the appeal and remanded the case to this Court

> for consideration on the merits of the issues raised in appellant's issues IV through IX and XI. Attorney William Ladd is to be entitled to proceed as lawyer guardian ad litem to represent the interests of the deceased minor. The issues in this case are of substantial importance, have been fully briefed, and are capable of arising again in future situations, but evading appellate review.[4]

The Supreme Court also allowed Gonzales to withdraw from the appeal. Thus, this case was assigned to this panel for a full hearing and decision with Ladd acting as the attorney representing baby Allison's interests.

### III. OVERVIEW

We commence with the obvious: baby Allison's life has ended, and we can do nothing to change that. Fundamentally, then, our task is to provide guidance to the courts that will deal with similar questions in the future. To that end, the attorneys representing the FIA and baby Allison have cooperated with our efforts to clarify the record and examine the issues. Additionally, the American Civil Liberties Union and Legal Services of Southern Michigan, the Children's Section of the State Bar of Michigan, the Michigan Protection and Advocacy Service, Inc., and a group of scholars

---

4  462 Mich 882 (2000).

in medical ethics have each provided us with a thoughtful amicus curiae brief.

Unfortunately, there is a mismatch between the way issues are numbered in this Court and the Supreme Court. There is also a mismatch between the way Ladd has presented issues for appeal to both courts and his substantive arguments concerning each issue. Consequently, it is difficult to determine from the Supreme Court remand order which legal questions this Court has an absolute duty to address. In any event, the Supreme Court's remand order does not prevent this Court from considering questions and issues not specified. Thus, we have addressed the widest range of issues necessary to assure that we have satisfied the Supreme Court's remand order and to create a framework for making decisions in similar end of life cases. Appendix B to this opinion, *post* at 243, identifies the issues presented in the application for leave to appeal to the Supreme Court and specifically locates where we address the respective issues in this opinion.

In order to organize the widely varying legal questions in this case, we first consider the issues that involve the broadest legal principles: the family court's jurisdiction; whether any of the three state statutes or the three federal statutes that Ladd cites prohibited the family court from entering an order permitting baby Allison's life support to be withdrawn; and the legal and evidentiary standards that apply to a decision to withdraw life support from an individual who is the subject of a protective proceeding and who was never competent to make a decision concerning medical care. We next examine the many interrelated questions concerning Mahinske's repre-

sentation, including a child's right to effective assistance of counsel in a protective proceeding and the procedural requirements affecting substitution of counsel in that context. In the final sections of the opinion we consider narrower questions, including whether the family court was operating under an improper local court rule and whether any errors in this case were harmless. After the conclusion, we summarize our individual legal holdings in Appendix A, *post* at 238-242, which might serve as a useful reference in the future.

### IV. STANDARD OF REVIEW

Virtually all the issues raised in this appeal present legal questions, subject to review de novo.[5] Only the question whether withdrawing life support was in baby Allison's best interests requires a factual determination, therefore meriting review for clear error.[6]

### V. SUBJECT-MATTER JURISDICTION

#### A. AUTHORITY TO HEAR A CASE

The allegations of neglect in the original petition gave the family court subject-matter jurisdiction over baby Allison under MCL 712A.2(b)(1) or (2). Ladd, nevertheless, contends that the family court was divested of its existing subject-matter jurisdiction when the FIA filed the amended petition seeking to withdraw life support, which changed the focus of the proceedings from protecting baby Allison to ending

---

[5] See *United States Fidelity & Guarantee Co v Citizens Ins Co*, 241 Mich App 83, 85; 613 NW2d 740 (2000).

[6] See MCR 2.613(C).

her life. Ladd argues that the family court lacks the broad authority given to the circuit courts under Const 1963, art 6, § 13. Rather, according to Ladd, the family court's authority is limited to the acts enumerated in the Juvenile Code.[7]

"Jurisdiction is the power of a court to act and the authority of a court to hear and determine a case."[8] As its name implies, subject-matter jurisdiction describes the types of cases and claims that a court has authority to address.[9] In other words:

> " 'Jurisdiction over the subject matter is the right of the court to exercise judicial power over that class of cases; not the particular case before it, but rather the abstract power to try a case of the kind or character of the one pending; and not whether the particular case is one that presents a cause of action, or under the particular facts is triable before the court in which it is pending, because of some inherent facts which exist and may be developed during the trial.' "[10]

"Jurisdiction of the subject matter of a judicial proceeding is an absolute requirement. It cannot be conferred by consent, by conduct or by waiver" or "by estoppel."[11] Subject-matter jurisdiction is so critical to a court's authority that a court has an independent

---

[7] See MCL 712A.1 *et seq.*

[8] *Grubb Creek Action Comm v Shiawassee Co Drain Comm'r*, 218 Mich App 665, 668; 554 NW2d 612 (1996).

[9] See *DAIIE v Maurizio*, 129 Mich App 166, 172; 341 NW2d 262 (1983); see also Black's Law Dictionary (6th ed), p 1425 (Subject-matter jurisdiction is a "court's power to hear and determine cases of the general class or category to which proceedings in question belong; the power to deal with the general subject involved in the action.").

[10] *Joy v Two-Bit Corp*, 287 Mich 244, 253-254; 283 NW 45 (1938), quoting *Richardson v Ruddy*, 15 Idaho 488, 494-495; 98 P 842 (1908), quoting Brown on Jurisdiction, § 1a.

[11] *Bandfield v Wood*, 104 Mich App 279, 282; 304 NW2d 551 (1981).

obligation to take notice when it lacks such jurisdiction, even when the parties do not raise the issue.[12]

Const 1963, art 6, § 15 grants probate courts "original jurisdiction in all cases of juvenile delinquents and dependents, except as otherwise provided by law." The family division of each circuit court has replaced the probate court in proceedings concerning custody of juveniles.[13] The Juvenile Code, MCL 712A.2(b), specifically grants the family courts in this state subject-matter jurisdiction of cases concerning children under eighteen years of age if, among other factors, the child's parents or guardians are neglectful as defined in subsection 1 or have failed to provide a fit home as defined in subsection 2. This and other statutes comprising the Juvenile Code are intended to give the family courts extensive authority to protect children.[14] Family courts thus have subject-matter jurisdiction in a large sphere of cases involving children.

In *In re Hatcher*,[15] the Michigan Supreme Court interpreted a family court's subject-matter jurisdiction, holding that it "is established when the action is of a class that the court is authorized to adjudicate, and the claim stated in the complaint is not clearly

---

[12] See *In re Estate of Fraser*, 288 Mich 392, 394; 285 NW 1 (1939).

[13] See MCL 600.1021(1)(e); see also MCL 600.1009.

[14] See MCL 712A.1(3) ("This chapter shall be liberally construed so that each juvenile coming within the court's jurisdiction receives the care, guidance, and control . . . conducive to the juvenile's welfare . . . ."); *In re Brock*, 442 Mich 101, 107-108; 499 NW2d 752 (1993) ("The purpose of child protective proceedings is the protection of the child . . . ." and "The juvenile code is intended to protect children from unfit homes . . . ."); see also *In re Macomber*, 436 Mich 386, 389; 461 NW2d 671 (1990) ("The Legislature has given a broad grant of authority to the probate court to protect children who come within its jurisdiction.").

[15] *In re Hatcher*, 443 Mich 426; 505 NW2d 834 (1993).

frivolous."[16] Accordingly, a family court has subject-matter jurisdiction when the allegations in the petition provide probable cause to believe that it has statutory authority to act because the child's parent or guardian neglected the child, failed to provide a fit home, or committed any of the other conduct described in the statute.[17] Whether the allegations are later proved true is irrelevant to whether the family court has subject-matter jurisdiction.[18]

### B. EXERCISING AUTHORITY

As Ladd concedes, the allegations in the original petition unambiguously gave the family court subject-matter jurisdiction. At the first hearing, referee Smart had probable cause to believe that baby Allison's mother, KB, was incapable of providing baby Allison with "proper custody" or a fit home because she lacked the mental capacity and financial resources to care for her daughter. These allegations were serious, not frivolous. The requisite probable cause to believe that this case fit within the class of cases that a family court may hear under MCL 712A.2(b) clearly existed, thereby justifying the decision to authorize the original petition.[19]

The amended petition did not allege new or different grounds for the family court's subject-matter jurisdiction. Rather, the amended petition alleged the same factual foundation for the family court's continuing subject-matter jurisdiction and asked the family

---

[16] *Id.* at 437.

[17] *Id.* at 433-435.

[18] *Id.* at 437-438.

[19] See MCR 5.965(B)(9).

court to *exercise* its jurisdiction by "render[ing] a decision about what is in the best interest of this infant." Whether the family court erroneously determined the scope of its authority to act, erred in deciding what was in baby Allison's best interests, or failed to follow proper procedures in this case is irrelevant to whether it had subject-matter jurisdiction.[20] As this Court explained in *Altman v Nelson*:[21]

> Once jurisdiction of the subject matter and the parties is established, any error in the determination of questions of law or fact upon which the court's jurisdiction in the particular case depends is error in the exercise of jurisdiction. Jurisdiction to make a determination is not dependent upon the correctness of the determination made.

Stated another way, "If the court has jurisdiction of the parties and of the subject matter, it also has jurisdiction to make an error."[22]

Ladd, however, presses the relationship between the general purpose of the proceeding over which a court originally has subject-matter jurisdiction and how it is asked to exercise its authority. Essentially, he contends that a family court may be asked to take some actions that are so far removed from the allegations supporting its original jurisdiction over the case that the court would lack basic authority to act on such a request. *Altman* does make a fine-line distinction between *acquiring* subject-matter jurisdiction and the potentially erroneous *exercise* of that jurisdiction. However, *Altman* describes the sort of erroneous exercise of authority that deprives the court of

---

[20] See *Joy, supra.*

[21] *Altman v Nelson*, 197 Mich App 467, 473; 495 NW2d 826 (1992).

[22] *Id.*; see also *Hatcher, supra* at 437.

subject-matter jurisdiction as the "determination of questions of law or fact *upon which the court's jurisdiction in the particular case depends.*"[23] Theoretically, then, some cases may develop in a direction so unrelated to the grounds for assuming subject-matter jurisdiction under MCL 712A.2(b) that a family court may not proceed.

Nevertheless, this case does not present such a dramatic change in direction. In the original petition, the FIA asked the family court to take temporary custody of baby Allison because someone needed to care for her, which included making medical decisions for her. KB, baby Allison's mother, would naturally make this sort of decision. However, KB was, at least allegedly, unable to fulfill this role and no one else had legal authority to make decisions for baby Allison. In the amended petition, the FIA requested the family court to make an explicit decision regarding baby Allison's interests because, again allegedly, KB could not do so and no one else had legal authority to make that decision. The amended petition raised questions of fact and law that depended entirely on the statutory bases for subject-matter jurisdiction in this case. While baby Allison's health status may have been changing, her underlying need to have someone make decisions for her and to care for her remained the same throughout the proceedings. Thus, this request for a best interests ruling still was within the "class" of cases or issues concerning which the family court may make a decision.[24]

---

[23] *Altman, supra* at 473 (emphasis added).

[24] *Hatcher, supra* at 444.

Though Ladd attempts to distinguish between the family court's responsibility to protect children and the effect of removing life support, the request for relief in the amended petition, at least arguably, did not ask the family court to abandon its duty to protect baby Allison. Rather, the amended petition asked for a ruling on what course of conduct would be in baby Allison's best interests. In *In re Rosebush*,[25] this Court held that courts can permit the parents or other surrogates for an incompetent patient to make serious medical decisions, including whether to withdraw life support, as long as the decision conforms to the substituted judgment or best interest criteria, as relevant. The *Rosebush* Court determined that judicial intervention in the decision to withdraw life support is warranted if "the parties directly concerned disagree about treatment, or other appropriate reasons" exist.[26]

Baby Allison's father was never legally determined. Her putative father's legal situation called into question his ability to make decisions on her behalf. Baby Allison's mother was, allegedly, incompetent. The possible absence of an appropriate surrogate to make decisions for baby Allison did not lessen the urgency of her situation. The staff of Children's Hospital needed immediate direction concerning baby Allison's care, regardless of whether it was a decision to continue all medical measures or to withdraw the life-sustaining medical technology in place. These, we conclude, were "other appropriate reasons" for the

---

[25] See *In re Rosebush*, 195 Mich App 675, 683, 688-690; 491 NW2d 633 (1992); see also *In re Martin*, 450 Mich 204; 538 NW2d 399 (1995).

[26] *Rosebush, supra* at 687.

family court to become involved with the decision concerning baby Allison's care.

## C. TREATMENT AS PROTECTION

Ladd cites an unpublished Virginia case, *In re Infant C*,[27] for the proposition that withdrawing life support is outside the scope of a family court's subject-matter jurisdiction because it is not medical "treatment." He argues that only therapeutic medical treatment is a protective measure within the family court's subject-matter jurisdiction.

Yet, the FIA never contended that withdrawing life support was equivalent to medical treatment in the sense that it had therapeutic or curative value. Dr. Delaney-Black did not propose removing baby Allison from the ventilator and stopping the prostaglandin as a way to cure or improve her ailments, or prolong her life. From Dr. Delaney-Black's perspective, no medical intervention would cure baby Allison's many health problems or prolong her life. Rather, Dr. Delaney-Black asserted that her purpose in recommending these actions was to allow baby Allison to live in as little pain as possible because her death was unavoidably imminent. In this respect, it is at least arguable that Dr. Delaney-Black was acknowledging baby Allison's common-law right to refuse medical care, a corollary to her right to give informed consent.[28] Dr. Delaney-Black also might have been acknowledging her own interest as a physician in making her patient as comfortable as possible. Thus, we conclude that it is unnecessary to use the fiction—and a fiction it

---

[27] *In re Infant C*, 1995 WL 1058596 (Va Cir Ct, 1995).

[28] See *Rosebush, supra* at 680-682; see also *In re Martin, supra* at 216.

surely is—of categorizing withdrawing life support as medical "treatment" to demonstrate the family court's subject-matter jurisdiction in this case.[29]

### VI. PERSONAL JURISDICTION

Ladd claims that the family court lacked the legal authority to enter an order to withdraw baby Allison's life support because it lacked personal jurisdiction over baby Allison's mother, KB, and her putative father, JB. At issue here is whether KB and JB received notice of the protective proceeding. Aside from the constitutional right to notice inherent in due process,[30] respondents in child protective proceedings have a statutory right to notice.[31] The absence of this notice to a respondent in a protective proceeding constitutes a jurisdictional defect.[32] Therefore, failure to give adequate notice to a respondent[33] in a protective proceeding makes "all proceedings in the [family] court void,"[34] at least with respect to the respondent denied notice.

---

[29] See, generally, *Causey v St Francis Medical Center*, 719 So 2d 1072, 1074 (La App, 1998) (family claimed that removing life support was unauthorized "treatment" constituting battery).

[30] See *In re Juvenile Commitment Costs*, 240 Mich App 420, 440; 613 NW2d 348 (2000).

[31] MCL 712A.12; see also MCR 5.920.

[32] See *In re Mayfield*, 198 Mich App 226, 231; 497 NW2d 578 (1993).

[33] The case law holding that failure to give notice is a jurisdictional defect arises in the context of the hearing to terminate parental rights because of the notice requirement in MCL 712A.12. However, MCR 5.921(B) uses equally clear mandatory language requiring the family court to "ensure" notice to certain individuals in other types of hearings. Thus, there is no obvious rationale for concluding that notice was not necessary in this case because there was no termination hearing.

[34] See *In re Atkins*, 237 Mich App 249, 251; 602 NW2d 594 (1999).

Determining exactly who was a respondent in a protective proceeding, and therefore entitled to notice, is often a mundane question answered simply by looking at the caption in a case or other pleadings. In this case, rather than using a caption listing the respondents, Matlock drafted the original and amended petitions so that only baby Allison's name appeared in the caption. Matlock named KB as baby Allison's "mother" and JB as baby Allison's "father," listing the addresses of their respective residences in the same section of each petition. It would be wholly illogical to conclude that, even though the FIA as petitioner knew where KB and JB each were living and denominated them as baby Allison's parents, there were no respondents in this proceeding. In fact, no one challenges the notion that KB, as baby Allison's mother, was a respondent.

Nevertheless, a putative father ordinarily has no rights regarding his biological child, including the right to notice of child protective proceedings, until he legally establishes that he is the child's father.[35] JB never took this step. Still, in this unusual case, because Matlock identified JB and KB in exactly the same way in the petitions, it appears that JB was a respondent, despite his status as a putative father. Thus, though referee Smart may have had authority to conduct the preliminary hearing and place baby Allison before JB and KB received notice of the proceeding,[36] both were entitled to notice of other hearings held in the case.[37]

---

[35] See *In re NEGP*, 245 Mich App 126, 134; 626 NW2d 921 (2001).

[36] See MCR 5.965(B)(1), (2).

[37] See MCR 5.921(B)(1)(a).

There is no way to determine from the record that KB actually received notice of the second hearing in this case because Matlock gave contradictory statements on the record regarding her contact with KB. Even assuming that Matlock told KB's aunt about the hearings, there is no evidence that Matlock asked the aunt to inform KB of any of the hearings. Nor is there any evidence that KB's aunt told KB about the second hearing. Further, to our knowledge, KB's aunt was not her legal guardian. Thus, there is no legitimate argument that notice to the aunt, alone, would be sufficient.[38] It was error to allow this action to proceed without ever ensuring[39] that KB, regardless of her alleged intellectual limitations, received notice.

The situation surrounding JB is even more complicated. As referee Schummer put it, JB was unavailable to make decisions because he was incarcerated and "the fact that he is the father of the mother, as well as the father of the child would lead the Court to believe that he is not qualified to make that kind of decision anyway." Though apparently also a respondent, the record does not give us a basis to conclude that JB received notice of the second hearing or that there were legitimate reasons to deny him notice.[40] Even if accurate, moral judgments cannot take the place of mandated procedures. As a result, though we also have serious doubts about JB's fitness to make *any* decision for baby Allison, because the circumstances of this case suggest that he was a respondent,

---

[38] But see *id.* (notice to respondent is mandatory).

[39] MCR 5.921(B)(1) (the family "court *shall* ensure" notice [emphasis added]).

[40] See, e.g., MCR 5.920(E); MCR 5.921(D)(3).

the failure to notify him of the proceedings was also error.

Nevertheless, it is well settled that the right to notice is personal and cannot be challenged by anyone other than the person entitled to notice.[41] Even if KB and JB would have been able to challenge any of the orders in this case successfully on the basis of their lack of notice, Ladd, representing baby Allison's interests, cannot now raise those issues.

VII. JUVENILE CODE

Ladd argues that the family court exceeded its statutory authority to order emergency medical care under the Juvenile Code, MCL 712A.1 *et seq*. He questions the family court's authority to withdraw life support pursuant to MCL 712A.18f. In practice, MCL 712A.18f(4) describes the process by which a family court can enter a dispositional order that provides a child with appropriate care *after* the family court has determined that the child comes within its jurisdiction.[42] In this context, jurisdiction has a very specific meaning. In order for a child to come within a family court's jurisdiction, the family court must hold an adjudication, which is a trial[43] on the merits of the allegations in the petition.[44] Following the adjudicative hearing,[45] the family court must find that a pre-

---

[41] See *In re Terry*, 240 Mich App 14, 21; 610 NW2d 563 (2000).

[42] See *Macomber, supra* at 400 ("There is no general statutory authorization for referees or judges to make dispositional orders prior to trial.").

[43] Alternatively, the respondent may enter a plea of admission or a no contest plea to the allegations in the petition, making a full trial unnecessary. See MCR 5.971.

[44] *In re Bechard*, 211 Mich App 155, 158; 535 NW2d 220 (1995).

[45] See n 41, *supra*.

ponderance of legally admissible evidence[46] demon-
strates that there is factual support for one of the
grounds permitting judicial involvement under MCL
712A.2(b).[47] Once the family court determines that the
child comes within its jurisdiction, it can enter dispo-
sitional orders that govern all matters of care for the
child.[48]

The form used for the "order" allowing the staff of
Children's Hospital to withdraw baby Allison's life
support states that it is a "dispositional order." This
"order" did resemble a dispositional order because it
directed others in how to care for baby Allison. How-
ever, it was not actually a dispositional order because
it was entered *before,* not *after,* a dispositional hear-
ing. A dispositional hearing can occur only *after* the
family court holds an adjudication.[49] The formal pro-
ceedings in this case never progressed past the pre-
liminary hearing at which referee Smart authorized
the petition.[50] Thus, even if MCL 712A.18f(4) would
allow a family court to order withdrawal of life sup-
port for an incompetent minor child already within its
jurisdiction, the family court had not yet acquired
jurisdiction over baby Allison. We conclude that the
family court lacked authority to act under MCL
712A.18f.

---

[46] See MCR 5.972(C)(1); *In re Snyder,* 223 Mich App 85, 88-89; 566
NW2d 18 (1997).

[47] See *Brock, supra* at 108-109.

[48] See MCR 5.973(A).

[49] *Id.* ("A dispositional hearing is conducted to determine measures to
be taken by the court with respect to the child properly within its jurisdic-
tion . . . once the court has determined following trial, plea of admission,
or plea of no contest that the child comes within its jurisdiction.").

[50] See *In re Albring,* 160 Mich App 750, 756; 408 NW2d 545 (1987); see
also *Bechard, supra* at 157, citing MCR 5.962(B)(3); MCR 5.965.

VIII. MCL 722.124a(1)

A. MEDICAL AND SURGICAL TREATMENT

Ladd also contends that MCL 722.124a(1) did not allow the family court to withdraw baby Allison's life support. MCL 722.124a(1) provides:

> A probate court, a child placing agency, or the department may *consent to routine, nonsurgical medical care, or emergency medical and surgical treatment of a minor child placed in out-of-home care* pursuant to [MCL 400.1 to MCL 400.121, MCL 710.21 to MCL 712A.28], or this act. If the minor child is placed in a child care organization, then the probate court, the child placing agency, or the department making the placement shall execute a written instrument investing that organization with authority to consent to emergency medical and surgical treatment of the child. The department may also execute a written instrument investing a child care organization with authority to consent to routine, nonsurgical medical care of the child. If the minor child is placed in a child care institution, the probate court, the child placing agency, or the department making the placement shall in addition execute a written instrument investing that institution with authority to consent to the routine, nonsurgical medical care of the child.[51]

By its language, this statute applies to children "placed in out-of-home care" pursuant to a variety of statutes concerning child welfare, adoption, and protection, including protective proceedings under the Juvenile Code, MCL 712A.1 *et seq.* Unlike MCL 712A.18f, which is tied to the dispositional phase of a child protective proceeding, MCL 722.124a(1) is not specifically related to any particular phase in any of the varied child welfare proceedings to which it

---

[51] Emphasis added.

applies. Ordering treatment under MCL 722.124a(1) primarily depends on whether the child has been "placed in out-of-home care." As a result, once a family court places a child in foster care or other "out-of-home" living arrangement, it has statutory authority to order medical or surgical treatment in an emergency, or routine, nonsurgical treatment even when there is no emergency.[52]

Notably, other than distinguishing between routine and emergency treatment, the statute does not spell out what treatment the family court may or may not order. Nor does the statute attempt to differentiate between the authority to order medical personnel to give treatment and the family court's authority to order them to withdraw treatment. More critically, the language in MCL 722.124a(1) makes no attempt to authorize any emergency activity other than "medical or surgical treatment." The key word here is "treatment," which as a noun means "the application of medicines, surgery, therapy, etc., in treating a disease or disorder."[53] In turn, the verb "treat" means "to act or behave toward in some specified way."[54] However, it is also defined as "to deal with (a disease, patient, etc.) in order *to relieve or cure*."[55] Whether the medical technologies and techniques at issue fall outside the definition of treatment depends on the particular

---

[52] See MCR 5.963, 5.965, 5.973.

[53] *Random House Webster's College Dictionary* (2d ed, 1997), p 1371; see also *Hoover Corners, Inc v Conklin*, 230 Mich App 567, 572; 584 NW2d 385 (1998) (presumptively the Legislature intended to give words in a statute their plain meaning and courts may use dictionary to ascertain that meaning).

[54] *Random House Webster's College Dictionary, supra* at 1370.

[55] *Id.* (emphasis added).

circumstances of each case.[56] However, once inter-
ventions, whether medical or surgical, cease to be
"treatment," the question is what legal authority
would permit those measures to continue, not what
authority would permit the family court to stop them.

### B. APPLICATION OF MCR 722.124a(1)

Whether the family court ever "placed" baby Allison
in "out-of-home care" is difficult to determine on the
basis of the record before us. The order entered fol-
lowing the first hearing ordered the FIA to place baby
Allison in foster care or suitable relative care. Yet,
baby Allison never lived with a foster family. Nor
does the record reflect that the FIA ever arranged for
a foster family to be involved with baby Allison's care
while she was in Children's Hospital. Our impression
from the medical record and Matlock's comments is
that members of baby Allison's extended family, espe-
cially her mother's aunts, were involved with baby
Allison's care and medical decisions during her short
life. However, we know so little about the kind and
extent of their involvement with baby Allison that we
cannot say that she was actually "placed" in their
care, triggering the family court's authority under
MCL 722.124a(1). For the most part, the record sug-
gests that the staff at Children's Hospital cared for
baby Allison. However, a hospital is excluded from
the definition of a "child caring institution"[57] in which

---

[56] Note, however, that palliative care, such as pain management, nutri-
tion, and even counseling, may still be effective at "relieving" a patient for
whom no cure of an underlying illness is possible. The facts of this case
do not require us to consider whether this statute provides any basis for
ceasing palliative care.

[57] MCL 722.111(1)(b).

the family court may place a child for "out-of-home care." Thus, even this informal, though medically necessary, arrangement for baby Allison's care certainly does not clearly fall within the parameters for authorizing emergency medical or surgical treatment under MCL 722.124a(1).

Nevertheless, we must resolve this issue even without a satisfactory record. Generally, the statute makes it possible for a family court or one of the other designated agencies to make health care decisions for a child when formal custody arrangements make it impossible for a parent to make a medical decision. In this case, KB was not in a position to make a medical decision for baby Allison, at least in part because the family court had temporarily removed baby Allison from her custody. Because JB had not been legally established as baby Allison's father and the order entered following the preliminary hearing prevented him from having contact with her, JB was not in a position to make medical decisions for her. Thus, we conclude that the family court had authority to order medical or surgical treatment for baby Allison pursuant to MCL 722.124a(1) because the order following the first hearing "placed" baby Allison in "out-of-home care" and because she had a medical emergency.

This, we think, is the only sensible interpretation and application of MCL 722.124a(1). In our view, to deprive a family court of the ability to make medical or surgical treatment decisions for a vulnerable and critically ill child who lacks a parent or guardian to make those decisions for her contravenes the Legislature's intent to protect children by granting the family

court jurisdiction in protective proceedings.[58] Consequently, the confusing custody arrangements in this case did not eliminate the family court's authority to act under MCL 722.124a(1) once referee Smart ordered the FIA to place baby Allison in foster care or with a relative.

As we have suggested, whether MCL 722.124a(1) gave the family court authority to order treatment also included the authority to withdraw life support depends on the circumstances of each case. Dr. Delaney-Black directly testified that the ventilator and prostaglandin had ceased to be "medical treatment" for baby Allison and that these measures posed serious risks to her health. We have significant reservations about the adequacy of this testimony and the family court procedures surrounding it. However, in the abstract, this testimony provided the family court with statutory grounds to authorize the Children's Hospital medical staff to remove baby Allison's life support.

### C. LIMITATIONS

Though MCL 722.124a(1) enabled the family court to act in this case even before holding an adjudication, we must stress that parties and family courts involved in protective proceedings must make *every* possible effort to hold an adjudication before authorizing withdrawal of life support. We emphasize that making this decision without first conducting an adjudication creates the very real risk that a family court will intervene in a private family decision when no

[58] See *Macomber, supra* at 389.

grounds under MCL 712A.2(b) actually exist to give the family court jurisdiction to act. In many cases, the allegations in a petition do not always fully represent the situation. The adjudication is the time to test those allegations so a family court can decide whether it has cause to become involved in a case. Just as importantly, MCL 722.124a(1) does not exist in a legal vacuum. As we will explain in greater detail, there are other procedural and substantive requirements that a family court *must* fulfill before it can order withdrawal of life support for an incompetent patient.

### IX. CAPTA

Ladd argues that even if state law allowed the family court to order the staff of Children's Hospital to withdraw the life-sustaining medical care baby Allison was receiving, the federal Child Abuse Prevention and Treatment and Adoption Reform Act (CAPTA)[59] prevented the FIA from seeking such an order.[60] Thus, he in essence contends that the family court lacked the authority to act on the FIA's illegal request.

In order to be eligible to receive CAPTA funds to prevent child abuse and neglect,[61] Congress requires, among other conditions,

---

[59] 42 USC 5101 *et seq*. Although truncated, CAPTA is the common acronym used for this act.

[60] The parties and some of the organizations serving as amici curiae have hotly debated whether the state has any legitimate interest in petitioning the family court to withdraw life support. However, we restrict our analysis to whether CAPTA prevents the FIA from seeking a court order that permits withdrawal of life support.

[61] *Jeanine B v Thompson*, 877 F Supp 1268, 1285-1286 (ED Wis, 1995).

an assurance that the State has in place procedures for responding to the reporting of medical neglect (including instances of withholding of medically indicated treatment from disabled infants with life-threatening conditions), procedures or programs, or both (within the State child protective services system), to provide for—

*          *          *

(iii) *authority, under State law, for the State child protective services system* to pursue any legal remedies, including the authority to initiate legal proceedings in a court of competent jurisdiction, as may be necessary *to prevent the withholding of medically indicated treatment from disabled infants with life threatening conditions.*[62]

In Michigan, the FIA functions as the chief agency in the state child protective services system. Consequently, if CAPTA applies, the FIA has a duty to *prevent* neglect, which includes "withholding . . . medically indicated treatment from disabled infants with life threatening conditions." At a theoretical level, this duty to prevent neglect might be viewed as contrary to a petition seeking to withdraw life support. However, 42 USC 5106g(6) specifically defines when withholding treatment constitutes medical neglect:

[T]he term "withholding of medically indicated treatment" means the failure to respond to the infant's life-threatening conditions by providing treatment (including appropriate nutrition, hydration, and medication) which, in the treating physician's or physicians' reasonable medical judgment, will be most likely to be effective in ameliorating or correcting all such conditions, *except* that the term does not include the failure to provide treatment (other than appropriate nutrition, hydration, or medication) to an infant when, in

---

[62] 42 USC 5106a(b)(2)(B) (emphasis added).

the treating physician's or physicians' reasonable medical judgment—

(A) the infant is chronically and irreversibly comatose;

(B) the provision of such treatment would—

(i) merely prolong dying;

(ii) not be effective in ameliorating or correcting all of the infant's life-threatening conditions; or

(iii) otherwise be futile in terms of the survival of the infant; or

(C) the provision of such treatment would be virtually futile in terms of the survival of the infant and the treatment itself under such circumstances would be inhumane.[63]

We can assume for the sake of analysis that Michigan is subject to CAPTA and that baby Allison was a "disabled infant" within the meaning of the act. Nevertheless, 42 USC 5106g(6) indicates that Congress did not prohibit withdrawing life support in all circumstances. Rather, if one[64] of the individual circumstances enumerated in 42 USC 5106g(6) exists, withdrawing life support from a critically ill infant does not constitute medical neglect.

According to Dr. Delaney-Black's testimony, baby Allison was conscious, not sedated. This suggested that baby Allison was not "chronically and irreversibly comatose." As a result, the exception in 42 USC 5106g(6)(A) did not allow the FIA to ask the family court to permit the staff of Children's Hospital to withdraw life support from baby Allison.

---

[63] Emphasis added.

[64] Congress drafted 42 USC 5106g(6) in the disjunctive, indicating that a health condition need not meet every circumstance listed to be excluded from the definition of medical neglect. See, generally, *Caldwell v Chapman*, 240 Mich App 124, 131; 610 NW2d 264 (2000).

However, Dr. Delaney-Black's testimony provided evidence that each of the conditions for exclusion under 42 USC 5106g(6)(B) and (C) applied in this case. In Dr. Delaney-Black's medical opinion, no available treatment would cure or alleviate baby Allison's life-threatening heart (and possibly intestinal) problems, while maintaining her on a ventilator and providing her with prostaglandin would do nothing more than temporarily delay her imminent death. In Dr. Delaney-Black's own words, continuing these "futile" treatments was "not a humane decision." Thus, even if CAPTA does require the FIA to prevent medical neglect, the FIA did not violate that duty by asking the family court to determine what would be in baby Allison's best interests, because that request was not medical neglect as Congress defined that term.

## X. EMTALA

### A. STABILIZATION

Ladd contends that the order to withdraw baby Allison's life support violated her right to have her emergency medical condition stabilized under the Emergency Medical Treatment and Active Labor Act (EMTALA).[65] Because baby Allison's life depended on a ventilator and prostaglandin, Ladd claims that EMTALA required the medical staff at Children's Hospital to provide these medical interventions indefinitely in order to stabilize her condition. Essentially, Ladd argues that a family court may not enter an order that violates a patient's EMTALA rights.

---

[65] 42 USC 1395dd.

EMTALA requires hospitals with emergency depart-
ments that receive Medicare funds to screen patients
for emergency conditions within the medical capabili-
ties of the facility.[66] If the patient has an emergency
medical condition, the hospital must provide "[n]ec-
essary stabilizing treatment."[67] If the hospital is una-
ble to treat the patient's emergency medical condi-
tion, it may transfer the patient to a facility that can
render the necessary care after providing the care
that is within the transferring hospital's capabilities.[68]
Otherwise, the hospital must stabilize the patient's
emergency medical condition before transferring the
patient to another facility.[69]

### B. *BABY K* AND *BRYAN*

There is very little case law interpreting EMTALA in
the context of withdrawing life support, and none
from Michigan. The most relevant and well-known
cases both come from the Fourth Circuit of the
United States Court of Appeals.

Ladd relies entirely on *In re Baby K*,[70] the first of
these Fourth Circuit cases. When Baby K was born,
doctors determined that she was anencephalic, mean-
ing that she had "a congenital malformation in which
a major portion of the brain, skull, and scalp are
missing."[71] Baby K did have a brain stem, which
allowed her autonomic system to continue to function

---

[66] 42 USC 1395dd(a).

[67] 42 USC 1395dd(b).

[68] 42 USC 1395dd(b)(1)(B); see also 42 USC 1395dd(c)(2).

[69] 42 USC 1395dd(b)(1)(A).

[70] *In re Baby K*, 16 F3d 590 (CA 4, 1994).

[71] *Id.* at 592.

even though she was permanently unconscious.[72] Physicians placed Baby K on a ventilator because she began experiencing difficulty breathing.[73] Because anencephalic babies typically die soon after birth, the physicians believed that any treatment would be futile.[74] The physicians asked the mother to approve a medical order not to resuscitate Baby K in the future, but the mother refused.[75]

When the mother and hospital staff could not agree on Baby K's care, the hospital contacted other local hospitals to determine if any of them would be willing to provide Baby K with the care her mother wanted.[76] No other hospitals with pediatric intensive care units were willing to undertake this care, but Baby K's mother was able to transfer her to a nursing home during a period when she did not need a ventilator to aid her breathing.[77] While at the nursing home, Baby K had to be readmitted to the hospital three times because of respiratory distress.[78]

After Baby K's second emergency hospital admission, the hospital brought a declaratory action in the federal district court seeking judicial approval to abstain from providing any aggressive treatment for Baby K in the future.[79] Baby K's guardian ad litem and her biological father joined with the hospital in opposing the mother's efforts to use any medical

[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *Id.* at 592-593.
[76] *Id.* at 593.
[77] *Id.*
[78] *Id.*
[79] *Id.*

intervention available to keep Baby K alive.[80] The district court, however, denied the requested relief.[81]

On appeal, the court found the hospital's arguments unpersuasive, especially in light of the hospital's concession that ventilator support or other aggressive treatment would be necessary to stabilize Baby K in the emergency room if she were in respiratory distress.[82] The court rejected the proposition that anencephaly, not respiratory distress, was the emergency medical condition Baby K exhibited and for which she needed treatment in the hospital's emergency room.[83] The court found no statutory language or Congressional intent to excuse the hospital from providing stabilizing medical care for emergency conditions even if treatment would be futile in the long term and therefore *above* the standard of care.[84] Finally, the court concluded that there was no statutory support for the argument that stabilization is necessary only if the hospital is transferring the patient to another facility.[85] As the court noted, hospitals would be able to evade their duty to treat emergency medical conditions simply by refusing to transfer a patient if this interpretation of EMTALA were correct.[86] Thus, the court held[87] that "EMTALA gives rise to a duty on the part of the Hospital to provide respiratory support to Baby K when she is presented at the

---

[80] *Id.*
[81] *Id.*
[82] *Id.* at 594-595.
[83] *Id.* at 595-596.
[84] *Id.* at 596.
[85] *Id.* at 597.
[86] *Id.* at 597-598.
[87] *Id.* at 592; see also *id.* at 598.

Hospital in respiratory distress and treatment is requested for her."[88]

The second relevant EMTALA case from the Fourth Circuit, which Ladd does not cite, is *Bryan v Rectors & Visitors of Univ of Virginia*.[89] According to the complaint in *Bryan*, the decedent, Shirley Robertson, was transferred to the University of Virginia Medical Center (UVMC) when she suffered respiratory distress.[90] Robertson's family asked UVMC staff to make all efforts to keep her alive.[91] Against their wishes, twelve days after Robertson was admitted to UVMC, the hospital's staff gave a "do not resuscitate" order for her.[92] Eight days later, UVMC staff allegedly failed to stabilize Robertson,[93] and she died.

Cindy Bryan sued on behalf of Robertson's estate, alleging that UVMC's failure to stabilize Robertson violated EMTALA and caused her death.[94] The federal district court dismissed the suit after it concluded that state tort law, not EMTALA, governed how a hospital must treat a patient once the patient leaves the emergency room and is admitted to the hospital.[95] On appeal, the court reviewed the legislative history of EMTALA, observing that "Congress's sole purpose in enacting EMTALA was to deal with the problem of

---

[88] When the Sixth Circuit partially rejected *Baby K* and interpreted EMTALA to require evidence of "improper motive" in a hospital's transfer decision, the United States Supreme Court reversed. *Roberts v Galen of Virginia, Inc*, 525 US 249; 119 S Ct 685; 142 L Ed 2d 648 (1999).

[89] *Bryan v Rectors & Visitors of Univ of Virginia*, 95 F3d 349, 351 (CA 4, 1996).

[90] *Id.* at 350.

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.* at 349-350.

[95] *Id.* at 350.

patients being turned away from emergency rooms for non-medical reasons."[96]

> Once EMTALA has met that purpose of ensuring that a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, the patient's care becomes the legal responsibility of the hospital and the treating physicians. And, the legal adequacy of that care is then governed not by EMTALA but by the state malpractice law that everyone agrees EMTALA was not intended to preempt. . . . Such reprehensible disregard for one's patient as Bryan hypothesizes would not constitute the "dumping" at which EMTALA aims but the well established tort of abandonment, which the states may expand or constrict as they deem just but which Congress evidenced no desire to federalize. Presumptively aware of this feature of state tort law, Congress did not address a hypothetical problem that was not before it but addressed a national scandal that was: emergency rooms' turning away patients at the door for inability to pay or other similar reasons.
>
>      . . . [T]he stabilization requirement [in EMTALA] was intended to regulate the hospital's care of the patient *only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment.* It cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context.[97]

The court also rejected Bryan's argument that *Baby K* extended EMTALA's protections beyond the emergency room, stating, "The holding in *Baby K* . . . turned entirely on the substantive nature of the stabilizing treatment that EMTALA required for a particular emergency medical condition. The case did not present the

---

[96] *Id.* at 351.

[97] *Id.* at 351-352 (emphasis added).

issue of the temporal duration of that obligation, and certainly did not hold that it was of indefinite duration."[98] Thus, the court affirmed the district court's order dismissing the case because Bryan could not show that UVMC staff failed to stabilize Robertson when she arrived in the emergency room, even if the hospital's subsequent conduct may have violated other legal duties.[99]

### C. EMTALA APPLIED

We assume for the sake of analysis that Children's Hospital does receive Medicare funds and has an emergency room. However, there is no evidence of an EMTALA violation in this case. Unlike in *Baby K*, there is no evidence that baby Allison, who was born in Oakwood Hospital, was ever sent to Children's Hospital's emergency room for treatment. Also unlike the situation in *Baby K*, in this case Children's Hospital did not attempt to create a policy that would have its emergency room staff treat babies with baby Allison's conditions differently than other patients who required prostaglandin and ventilator support.

This case is much closer to *Bryan* because baby Allison had been admitted to Children's Hospital for more than a week when the staff made the decision to discontinue the medical interventions. Children's Hospital staff might be liable for withdrawing baby Allison's life support, especially because they did not wait for the seven-day judicial-review-request period to end. However, applying *Bryan's* holding to this case, the actions of the Children's Hospital staff were

---

[98] *Id.* at 352.

[99] *Id.* at 353.

not an EMTALA violation because baby Allison had been admitted as a patient at the time the staff withdrew life support. The only hospital conduct in this case involving EMTALA was Oakwood Hospital's decision to transfer baby Allison to Children's Hospital. However, Oakwood Hospital staff fulfilled EMTALA's mandate by stabilizing baby Allison before transferring her to a hospital with the facilities necessary to care for her.

Even if *Bryan* did not fit this case as well as it does, the language Congress used in EMTALA would still require this result. The standards EMTALA puts in place affecting treatment specifically control hospital conduct, not patient autonomy or decisions by appropriate surrogates. There simply is no evidence that EMTALA abrogates the common-law right to informed consent and the corollary right to refuse treatment, much less any other applicable statutory rights. In sum, putting aside the other serious questions this case poses, the "order" permitting Children's Hospital staff to withdraw baby Allison's life support outside the context of emergency room treatment did not implicate EMTALA, much less violate it.

## XI. ADA AND PWDCRA

Ladd contends that the family court and the FIA violated the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, by presuming that baby Allison's mother was incompetent to make decisions for her. Ladd argues that baby Allison's mother *and* baby Allison were denied their mutual rights to have baby Allison or a "legally designated surrogate" make medical decisions for baby Allison, that both their rights to have access to the courts were violated, and that they

were denied their substantive rights to a familial relationship. Ladd claims that because of the way the FIA and the family court perceived baby Allison's disabilities, the FIA and the family court acted prematurely in seeking and approving discontinuation of her life support. Ladd also asserts that these same actions violated KB's rights *and* baby Allison's rights under the Persons with Disabilities Civil Rights Act (PWDCRA), MCL 37.1101 *et seq.* Thus, Ladd argues that the "order" permitting Children's Hospital staff to withdraw baby Allison's life support was legally invalid because it was a product of proceedings that violated these antidiscrimination laws.

These are serious allegations. Not only is discrimination by the courts and state agencies typically contrary to these statutes,[100] discrimination is incompatible with the evenhanded treatment we expect state agencies and courts to give to individuals. Nevertheless, three considerations convince us not to address the merits of these arguments.

First, the briefing on these issues is inadequate to allow this Court to decide whether the FIA or the family court violated the ADA or the PWDCRA.[101] Second, this Court has implicitly held that a party must raise

---

[100] See *Terry, supra* at 25-26 (the FIA is subject to the ADA); see also *Soto v City of Newark*, 72 F Supp 2d 489, 494-495 (D NJ, 1999) (court violated the ADA by refusing three requests by profoundly deaf plaintiffs to provide a qualified sign language interpreter at their wedding ceremony in a courthouse, which plaintiffs could not understand); *Matthews v Jefferson*, 29 F Supp 2d 525, 534 (WD Ark, 1998) (county court violated the ADA by scheduling three hearings in a second-floor courtroom that the wheelchairbound litigant could not access); *State v PE*, 284 NJ Super 309, 316-317; 664 A2d 1301 (1994) (the ADA and state antidiscrimination law required a court to appoint an attorney to represent a mentally ill defendant in order to ensure the defendant's court access).

[101] See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

ADA claims in the family court before they can be asserted as a defense on appeal.[102] This requirement is consonant with our ordinary issue preservation standard.[103] As a result, we conclude that a party must also raise PWDCRA claims in the family court before being allowed to make arguments concerning the PWDCRA on appeal. Yet, neither Ladd nor Mahinske raised the ADA or PWDCRA issues in the family court. Third, addressing Ladd's arguments regarding the ADA and the PWDCRA as grounds for reversal in this case would be imprudent because it would require making original factual findings without the benefit of an adequate record, which is especially problematic because appellate courts do not sit as triers of fact.

Even if these considerations did not dissuade us from addressing the substance of Ladd's arguments, *Green v North Arundel Hosp Ass'n, Inc*,[104] persuades us that parties cannot use the ADA or the PWDCRA to challenge the result of proceedings in a case that did not originally allege an ADA or PWDCRA violation. *Green* was a medical malpractice action parents brought on behalf of their minor child against the physicians who treated the child for hydrocephaly.[105] The defendants moved to bar the child from the courtroom during the liability phase of trial.[106] After observing the child's disabilities in a videotape, the judge granted the motion.[107]

---

[102] *Terry, supra* at 27.

[103] See *In re Hildebrandt*, 216 Mich App 384, 388; 548 NW2d 715 (1996).

[104] *Green v North Arundel Hosp Ass'n, Inc*, 126 Md App 394; 730 A2d 221 (1999), cert gtd 356 Md 17 (1999), aff'd 2001 WL 1491567 (Md).

[105] *Id.* at 398.

[106] *Id.* at 400.

[107] *Id.*

The plaintiffs in *Green* did not succeed in the mal-practice suit.[108] On appeal, they claimed that exclud-ing the child from the trial violated the ADA.[109] After examining the text of the ADA, the Maryland appellate court, however, concluded:

> [T]he ADA allows for action only *against the public entity for prospective injunctive relief*—there is nothing in the ADA that provides a basis for reversing the judgment of a lower court in a civil dispute between private parties. Therefore, assuming, *arguendo*, that [the trial judge's] ruling constituted a violation of the ADA, this would only give [the child plaintiff] a separate cause of action for injunctive relief against the trial judge in his official capacity as a judi-cial officer of the State—it would not constitute reversible error in the case *sub judice*. Thus, whether [the trial judge's] exclusion of [the child plaintiff] from trial violates the ADA is irrelevant to the outcome of this case.[110]

*Green's* reasoning, that the ADA cannot be used as a procedural challenge to the outcome of a case when the ADA is not a claim tried in that case, applies here. Further, like the appellate court in Maryland, we find no support in the PWDCRA's language for allowing a discrimination claim to alter the outcome of a pro-ceeding involving unrelated grounds. In short, even if the ADA and the PWDCRA would permit baby Allison and her mother to sue for the way they were treated by the FIA and in the family court,[111] whether we affirm or reverse depends solely on the independent

---

[108] *Id.* at 401.

[109] *Id.* at 416.

[110] *Id.* at 416-417.

[111] But see *Bd of Trustees of the Univ of Alabama v Garrett*, 531 US 356, 375; 121 S Ct 955; 148 L Ed 2d 866 (2001) (eliminating right to money damages in ADA title I suits against states, but not the right to sue for injunctive relief).

legal validity of the decisions and procedures used in this protective proceeding.[112] Discriminatory conduct in judicial proceedings may give rise to a due process or equal protection claim,[113] which are legally cognizable means to invalidate the outcome or a particular aspect of a judicial proceeding.[114] However, the PWDCRA and the ADA do not provide the same relief in cases not originally involving those antidiscrimination acts.

### XII. LEGAL AND EVIDENTIARY STANDARDS FOR WITHDRAWING LIFE SUPPORT

#### A. LADD'S ARGUMENT

Ladd contends that a family court must comply with the following requirements before it can enter an order permitting medical professionals to withdraw life-sustaining medical care. First, he asserts that the family court must determine whether the patient is competent to make decisions regarding medical treatment. A patient who is competent must be allowed to make the medical decision. Second, he argues that if the patient is incompetent, the family court must designate a surrogate to become involved in the decision.

---

[112] See *Green, supra* at 417-423 (considering whether child's exclusion from the courtroom violated his rights to due process or access to the courts as a member of the public).

[113] See *People v Brown*, 173 Mich App 202, 213-214; 433 NW2d 404 (1988), rev'd on other grounds sub nom *People v Juillet*, 439 Mich 34; 475 NW2d 786 (1991) (unavailing due process and equal protection claims for discrimination on the basis of his status as a former state senator).

[114] See, generally, *People v Bearss*, 463 Mich 623, 630; 625 NW2d 10 (2001) (reversed and remanded because Court of Appeals violated defendant's right to due process by directing a guilty verdict on a cognate lesser offense); *Green, supra* at 417-423; *People v Collins*, 239 Mich App 125, 133-138; 607 NW2d 760 (1999) (defendant entitled to resentencing because the trial court's restitution order violated his right to equal protection).

Third, he claims that a physician other than the physician treating the patient must confirm the patient's diagnosis and prognosis. Fourth, he argues that in order to justify withdrawing life support, the court making the decision must have evidence that meets the clear and convincing standard. Fifth, he avers that any hearing on the matter must comply with due process, which excludes ex parte hearings. Finally, he contends that a judge, not a hearing referee, must make the ultimate decision regarding whether to withdraw life support.

The proceedings in this case, Ladd insists, failed to comply with these standards other than with respect to the issue whether baby Allison was incompetent to make decisions for herself, which was undisputed. Thus, he claims, the "order" purporting to allow the staff of Children's Hospital to remove life support from baby Allison is subject to reversal on each of the other grounds. As the following analysis indicates, we not only agree, we find an additional flaw in the proceedings in this case involving allegations that the incompetent patient's parent or other surrogate is also incompetent.[115]

### B. PATIENT COMPETENCY AND THE DECISIONAL STANDARDS

Competent patients have the right to make medical decisions, including the decision to cease any medical intervention, under the doctrine of informed consent.[116] According to *Rosebush*, "The right to refuse

---

[115] Although not addressed in the briefs originally filed in this appeal, we have given Ladd, the FIA, and the amici curiae an opportunity to address this issue.

[116] See *Werth v Taylor*, 190 Mich App 141, 145; 475 NW2d 426 (1991), citing *Cruzan v Director, Missouri Dep't of Health*, 497 US 261; 110 S Ct

lifesaving medical treatment is not lost because of the incompetence or the youth of the patient."[117] Though legally still minors and considered otherwise incompetent, some young patients may be sufficiently "mature" to exercise this right on their own.[118] Thus, the mere fact that the medical decision involves a child subject to a protective proceeding does not conclusively resolve whether the patient is competent to make the necessary decision. In short, because a competent patient's right to make any medical decision is absolute,[119] if the facts of a case do not reveal conclusively whether a patient is competent to make a decision, the family court should make a direct inquiry concerning competency by means of an evidentiary hearing.[120]

When the patient is incompetent, a court considering whether to continue life support must determine whether the "substituted judgment" or the "best interests" legal standard applies.[121] The substituted judgment standard seeks to fulfill the expressed wishes of a previously competent patient, including a "minor of mature judgment."[122] The "limited-objective" substituted judgment standard used in Michigan requires " 'some trustworthy evidence that the patient would have refused the treatment, and the decision-maker is

---

2841; 111 L Ed 2d 224 (1990), and *In re Quinlan*, 70 NJ 10; 355 A2d 647 (1976).

[117] See *Rosebush, supra* at 681-682.

[118] *Id.* at 682, n 4.

[119] See *Werth, supra*.

[120] See, generally, *Martin, supra* at 209-210 (hearing to determine whether to withdraw life support also included evidence establishing that patient could not make his own decision).

[121] See *Rosebush, supra* at 683.

[122] *Id.* at 688-689.

satisfied that it is clear that the burdens outweigh the benefits of that life for' " the patient.[123]

The best interests standard applies when the patient has never been competent or has not expressed her wishes · concerning medical treatment.[124] The best interests standard includes, but is not limited to, examining:

> "[E]vidence about the patient's present level of physical, sensory, emotional, and cognitive functioning; the degree of physical pain resulting from the medical condition, treatment, and termination of the treatment, respectively; the degree of humiliation, dependence, and loss of dignity probably resulting from the condition and treatment; the life expectancy and prognosis for recovery with and without treatment; the various treatment options; and the risks, side effects, and benefits of each of those options."[125]

There are a number of theoretical problems with applying the best interests standard when presuming that the common-law right to refuse medical treatment provides the authority to withdraw life support.[126] However, the Michigan Supreme Court has not wholly rejected the best interests standard.[127] Consequently, as the law exists today, there is no absolute bar to applying the best interests standard to

---

[123] *Id.* at 688, quoting *In re Conroy*, 98 NJ 321, 365; 486 A2d 1209 (1985).

[124] See *Rosebush, supra* at 689-690.

[125] *Id.* at 690, quoting *In re Guardianship of Grant*, 109 Wash 2d 545, 568; 747 P2d 445 (1987), amended 757 P2d 534 (1988), quoting *Conroy, supra* at 397. (Handler, J., concurring in part and dissenting in part).

[126] See *Martin, supra* at 222. Note that this case revolves around MCL 722.124a(1) and does not completely rely on the common-law right to refuse care.

[127] See *Martin, supra* at 223-225 (only declining to apply the best interests standard because the patient had been competent and had expressed his wishes).

a decision to withdraw life support in a protective proceeding.

In this case, there is no question that baby Allison was incompetent to make any decision concerning her own medical care, which directly points to the best interests standard as the relevant decisional standard in this case.[128] Further, the FIA and Ladd agree that the best interests standard was appropriate.[129] Referee Schummer, therefore, did not err in deciding to apply the best interests standard to his factual findings and recommendation.

## C. SURROGATE DECISIONMAKERS

Ladd claims that once a family court determines that a patient is incompetent, it must appoint a guardian ad litem to protect the patient.[130] As support for this proposition, he points to *Rosebush*, which states, "[W]here the parents of a minor child for some reason are themselves incompetent to act as surrogate decision makers, and other family members are unavailable or unwilling to act as surrogates, a guardian should be appointed to exercise the minor's rights on behalf of the minor."[131] The *Rosebush* Court never had to address whether a family court should appoint a guardian ad litem because both parents of the minor patient in that case were (presumably) competent and involved in the decision to withdraw the child's life

---

[128] *Rosebush, supra* at 682.

[129] Cf. *In re KI*, 735 A2d 448 (US App DC, 1999).

[130] Ladd's arguments as a whole lead us to believe that in this argument he is referring to a guardian ad litem, not a guardian. In no way do we intend to change the family court's ability to appoint a guardian for a child in a protective proceeding.

[131] *Rosebush, supra* at 682, n 5.

support.[132] *Rosebush*, by approving the reasoning in *In re Guardianship of Barry*,[133] also rejected the proposition that parents must qualify as guardians before being allowed to decide to withdraw their minor child's life support,[134] which suggests that appointing a guardian ad litem is not always necessary. Further, *In re Shaffer*[135] holds that a family court need not routinely appoint different individuals to serve as guardian ad litem and attorney for a child in a protective proceeding. Of course, *Shaffer* was decided before the lawyer-guardian ad litem provisions in MCL 712A.17d were effective. *Shaffer* thus applies in this case and suggests that appointing only an attorney for baby Allison was legally adequate.

Nevertheless, other case law indicates that appointing a guardian ad litem for a legally incompetent patient who does not have a natural guardian, such as a parent, or a legal guardian to make a serious medical decision is often a prudent step to take.[136] As a practical matter, protective proceedings in which end-of-life medical care becomes an issue may require a guardian ad litem *and* an attorney for the child so that they may work with each other to respond to the urgency of the situation.[137] We do not hold that a family court must appoint a guardian ad litem in every protective proceeding concerning important medical decisions, especially if it decides to appoint a guardian or is acting while the

---

[132] *Id.* at 679.

[133] *In re Guardianship of Barry*, 445 So 2d 365, 372 (Fla App, 1984).

[134] *Rosebush, supra* at 685, 687.

[135] *In re Shaffer*, 213 Mich App 429, 432-433; 540 NW2d 706 (1995).

[136] See *Rosebush, supra* at 686-687, quoting *In re LHR*, 253 Ga 439, 446-447; 321 SE2d 716 (1984).

[137] See *Shaffer, supra* at 434-436.

new lawyer-guardian ad litem provisions are effective. However, generally, the need to appoint a guardian ad litem tends to increase as the seriousness of the medical decision increases and as the time in which to make a decision decreases.

Here, the medical decision was the gravest possible. No one individual seemed a likely candidate to act on baby Allison's behalf, at least from the perspective of the information available. Referee Smart presided at the first hearing, referee Schummer at the second. Other than Matlock, not one person who was at the first hearing participated in the second hearing. Even if Ladd was expected to function as both an attorney representing baby Allison *and* her guardian ad litem, he was excluded from the second hearing. This made his appointment wholly ineffective as a measure to protect or represent baby Allison. The scope and nature of Mahinske's duties to baby Allison are unclear. In any event, she was a latecomer to the proceedings. This threw into question whether she could actually function as a guardian ad litem or attorney for baby Allison. This lack of continuity made it difficult, if not impossible, to ensure that baby Allison's interests were adequately and consistently represented. Taken together, these factors persuade us that the hearing referees erred in failing to appoint a guardian ad litem for baby Allison, whether that guardian ad litem was a relative or another person. Though MCL 712A.17d may make a separate guardian ad litem unnecessary in the future, under the circumstances of this case, a guardian ad litem was necessary to ensure baby Allison's welfare.[138]

---

[138] MCR 5.916(A).

D. SURROGATE INCOMPETENCE

Ladd's guardian ad litem argument raises one of the central issues in this case: the proper procedure that a court must follow when there is an allegation that the parent or surrogate who would otherwise make a medical decision for the incompetent patient is *also* incompetent. This issue presents a truly thorny dilemma. On the one hand, to ignore allegations that the parent or other surrogate is incompetent might allow a person fundamentally unsuited to the task to make a critical life and death decision. On the other hand, to accept at face value the allegations that the parent or other surrogate is incompetent risks depriving the correct decisionmaker of the opportunity to make a decision.

Case law provides no direct guidance on the issue of surrogate incompetency. However, after examining competency issues in other contexts, we conclude that determining the competence of a parent or surrogate by engaging in a formal process, such as when a criminal court must determine whether a defendant is competent to stand trial, makes little sense in practice.[139] Instead, this issue must be resolved as any other factual dispute is resolved: with evidence appropriate to the circumstances. This evidence must demonstrate on the record that the person who would otherwise act as the surrogate decisionmaker for the incompetent patient is also incompetent to make the critical medical decision at issue. Further, the evidence must be clear and convincing. Any lower evidentiary standard brings with it a potential for

---

[139] See MCL 330.2020 *et seq.*

abuse leading to irreparable harm because there typically is no adequate remedy for an erroneous order withdrawing life support. This clear and convincing evidence standard comports with the fundamental liberty interest, protected by the Fourteenth Amendment, that parents have in caring for their children.[140] While doing nothing to lessen the quality or quantity of evidence necessary to justify judicial intervention in a private decision, the clear and convincing evidence standard is sufficiently flexible to address a wide variety of situations.

Further, making a decision to withdraw life support is so serious that it is unlike any other decision a family court has to make. This decision goes far beyond severing the legal relationship between a parent and child, as family courts must do in some protective proceedings. When a family court terminates parental rights, a child may still choose to seek out biological family members after reaching adulthood. Even if the family never reunites, a parent has the reassurance that the child will have an opportunity to live to be an adult. By contrast, traditional happy endings are impossible when removing life support.

We think it important to draw a distinction between cases in which the parent cannot make a decision for the child because of incompetency or another legitimate reason[141] and cases in which the factors bringing the case to the family court's attention are unrelated

---

[140] See *Troxel v Granville*, 530 US 57, 64-65; 120 S Ct 2054; 147 L Ed 2d 49 (2000).

[141] For instance, we doubt that a parent who physically abuses the child who is a patient is capable of weighing the competing considerations involved in determining the best interests of the child in an end-of-life decision. However, we decline to determine conclusively what these other reasons might be.

to the parent's competency or other factors that would disqualify the parent as a decisionmaker. Simply put, jurisdiction over the child *alone* is not reason enough for a court to make a decision to withdraw life support. Rather, the record *must* provide clear and convincing evidence to support the court's determination that it, not a parent or other surrogate, must make the decision to withdraw life support. Thus, when the allegation is that the parent or other surrogate is incapable of making a decision concerning the patient's care because of incompetency, there *must* be clear and convincing evidence that this incompetency actually exists.

It almost goes without saying that no such clear and convincing evidence of KB's alleged incompetence existed on the record in this case. Not a single person who participated at a hearing in this case or who had any role in the legal decision to withdraw baby Allison's life support had ever personally met KB. KB did not appear at any of the hearings. Even without a presumption of competency, there is absolutely no reliable evidence that KB was incompetent to make decisions for baby Allison.[142]

The FIA attempts to minimize the lack of evidence that KB was incompetent by submitting affidavits from Matlock and KB's aunt in which both refer to KB's alleged mental limitations. However, this Court may not consider these affidavits, which were prepared sixteen months after baby Allison died, because they are not part of the lower court record.[143] We

---

[142] Ladd does not argue that JB should have been allowed to decide whether to withdraw baby Allison's life support.

[143] *Reeves v Kmart Corp*, 229 Mich App 466, 481, n 7; 582 NW2d 841 (1998).

have no reason to believe that Matlock, KB's aunt, or anyone else misrepresented what they perceived to be KB's limitations. Indeed, we suspect that these allegations may be true. However, a mere suspicion is not enough. Without *any* direct, or even legally admissible, evidence of KB's incompetence, there is no way to exclude the possibility that she was competent to make a decision that *Rosebush* determined was ordinarily a parent's right to make.[144] Even if there were no other grounds for reversal, our resolution of this issue would warrant that outcome.

### E. INDEPENDENT PHYSICIAN CONFIRMATION

Ladd argues that a family court may not depend on a single treating physician's assessment of an incompetent patient's health and prognosis when deciding to remove life support. He relies on *Rosebush* and the authority cited in the *Rosebush* opinion to support this argument. Although *Rosebush* approved of the procedures outlined in *Barry*[145] and *In re LHR*,[146] both of which had two physicians to confirm the medical diagnosis, *Rosebush* does not explicitly require independent physician confirmation. Indeed, while an ethics panel reviewed Joelle Rosebush's case, the *Rosebush* opinion does not suggest that an independent physician confirmed her diagnosis or prognosis.[147] Moreover, the passages from *Barry* and *LHR* cited in *Rosebush* do not indicate that at least one physician who had *not* been involved in treating a

---

[144] *Rosebush, supra* at 683, 687.

[145] *Barry, supra* at 372.

[146] *LHR, supra* at 446-447.

[147] *Rosebush, supra* at 679.

patient render an opinion before a family court can decide to withdraw life support.

There are a number of competing interests for and against having an independent physician confirm a patient's diagnosis and prognosis. However, we conclude that it is incumbent on the petitioner to provide a second opinion from an independent physician or establish why this second opinion is not necessary. This fits in the context of the best interests analysis articulated in *Rosebush*, which already directs courts to consider a variety of factors relevant to the patient's prognosis and treatment options,[148] and thus does not require a separate analysis.[149] The family court may weigh the presence or absence of medical consensus, the factors that contributed to medical disagreement or agreement, and the factors that make any independent physician opinion more or less relevant to the ultimate decision to withdraw life support. Plainly, the family court did not engage in any such weighing here.

F. PROCEDURAL DUE PROCESS

Ladd contends that due process requires that parents be given notice and an opportunity to be heard at any hearing related to a request to withdraw life support from their child. This Court has observed:

---

[148] *Id.* at 690.

[149] A physician confirmation rule is inappropriate in cases in which the patient is competent and refuses treatment or cases in which a previously competent patient clearly expressed a treatment preference, no matter the degree of medical consensus. To hold otherwise would eviscerate the patient's right to give or withhold consent to treatment. See *Martin, supra* at 221-222.

> The federal and Michigan constitutions guarantee that the state cannot deny people "life, liberty, or property without due process of law." Due process, which is similarly defined under both constitutions, specifically enforces the rights enumerated in the Bill of Rights, and it also provides for substantive and procedural due process. Procedural due process limits actions by the government and requires it to institute safeguards in proceedings that affect those rights protected by due process, such as life, liberty, or property.[150]

At issue here is the right to procedural due process.[151] A procedural due process analysis requires a court to consider "(1) whether a liberty or property interest exists which the state has interfered with, and (2) whether the procedures attendant upon the deprivation were constitutionally sufficient."[152]

There is no question that parents have a due process liberty interest in caring for their children[153] and that child protective proceedings affect that liberty interest.[154] As a result, a court considering withdrawing life support from a child who is the subject of a protective proceeding must determine whether its procedures are "constitutionally sufficient."[155] Whether procedures are adequate depends on the factors enunciated in *Mathews v Eldridge:*[156]

---

[150] *Kampf v Kampf*, 237 Mich App 377, 381-382; 603 NW2d 295 (1999) (citations omitted).

[151] See *Bundo v Walled Lake*, 395 Mich 679, 696; 238 NW2d 154 (1976).

[152] *Jordan v Jarvis*, 200 Mich App 445, 448; 505 NW2d 279 (1993), citing *Kentucky Dep't of Corrections v Thompson*, 490 US 454, 460; 109 S Ct 1904; 104 L Ed 2d 506 (1989).

[153] See *Troxell, supra.*

[154] See *In re Kirkwood*, 187 Mich App 542, 546; 468 NW2d 280 (1991).

[155] *Jordan, supra* at 448.

[156] *Mathews v Eldridge*, 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976).

> First, the private interest that will be affected by the offi-
> cial action; second, the risk of an erroneous deprivation of
> such interest through the procedures used, and the prob-
> able value, if any, of additional or substitute procedural
> safeguards; and finally, the Government's interest, including
> the function involved and the fiscal and administrative bur-
> dens that the additional or substitute procedural require-
> ment would entail.

The fundamental principle underlying these factors, which constitute a balancing test, is that due process " 'is flexible and calls for such procedural protections as the particular situation demands.' "[157]

In light of the private interests that can be affected with an order permitting life support to be withdrawn and the risk of erroneous deprivation of that right in an ex parte hearing, we agree that ex parte hearings are undesirable when making this sort of decision. However, to the extent that Ladd asks us to create an absolute bar to ex parte hearings, we decline the invitation. There may be a case in which the state's interest in providing care for children might outweigh a respondent's right to notice and an opportunity to be heard when the state provides additional safeguards. Such a case certainly would be an exception, not the rule, but nevertheless might be constitutionally sound under due process principles.[158] We are confident that the law is sufficiently well developed to guide courts addressing many different situations, including this end-of-life issue.

---

[157] *Id.* at 334, quoting *Morrissey v Brewer*, 408 US 471, 481; 92 S Ct 2593; 33 L Ed 2d 484 (1972).

[158] See, generally, *Hodgson v Minnesota*, 497 US 417, 447, n 32; 110 S Ct 2926; 111 L Ed 2d 344 (1990) (STEVENS, J.) (common law permits one parent to act as an agent for the other parent).

Due process protected baby Allison's parents' liberty interest in raising their child.[159] Baby Allison's parents also had a virtually exclusive interest in making a decision to withdraw life support, rendering judicial involvement in the decision not only rare, but of significant consequence for their rights as parents.[160] Though this case presents some of the most disturbing facts imaginable, it was not constitutionally acceptable to deny baby Allison's mother due process because of her alleged incompetence or to deny her putative father due process because of the crimes he may have committed. The right to due process protects individuals who are allegedly incompetent[161] and criminals ultimately convicted of the most heinous crimes.[162] As a result, we conclude that baby Allison's mother, KB, and her putative father, JB, were entitled to procedural safeguards in this child protective proceeding.

As the discussion of the personal jurisdiction issue indicates, we have strong suspicions that neither parent had actual notice of the two hearings. This also suggests that they were deprived of their due process right to notice and an opportunity to be heard. Assuming that KB and JB were denied notice and an opportunity to be heard, the risk of erroneous deprivation of their due process rights was different at the

---

[159] See *Troxell, supra; Kirkwood, supra.*

[160] *Rosebush, supra* at 687.

[161] See, generally, *In re KB*, 221 Mich App 414, 418-422; 562 NW2d 208 (1997) (individual subject to civil commitment is entitled to due process, though procedures at issue were adequate).

[162] See, generally, *People v Duncan*, 462 Mich 47, 55-57; 610 NW2d 551 (2000), quoting and adopting *Harmon v Marshall*, 69 F3d 963 (CA 9, 1995) (complete failure to define an offense for the jury violated the criminal defendant's right to due process).

two hearings. The order entered following the first hearing instructed the medical staff to do all that was necessary to sustain baby Allison's life. This order addressed the crisis immediately at hand but still allowed KB and JB to have notice and an opportunity to be heard at a subsequent hearing, which referee Smart actually scheduled. Because baby Allison's precarious medical condition constituted an emergency and the state had a legitimate interest in doing what it could to protect her life, holding an initial hearing and then providing for notice and an opportunity to be heard later was not just permissible under the court rules,[163] it was also constitutionally sound.[164]

The second hearing presents a vastly different picture. The record again strongly suggests that neither KB nor JB had notice of or an opportunity to be heard at the second hearing. The "order" permitting the Children's Hospital staff to remove baby Allison's life support was not intended to be effective for seven days, which would have allowed KB or JB to petition for rehearing.[165] The state did nothing to violate this seven-day period; Children's Hospital staff, apparently in consultation with some members of baby Allison's family, took the action that directly caused baby Allison's death. Yet, baby Allison's death was the predictable result of the "order" entered following the second hearing. This foreseeable risk of erroneously depriving her parents' interests was undeniably quite high.

---

[163] See MCR 5.965(B)(1), (2).

[164] *Kampf, supra* at 383-384.

[165] See MCR 5.992.

Critically, the FIA has never placed any substantial evidence on the record that would justify withdrawing life support without parental notice and participation in this case. While giving parents notice and an opportunity to be heard may cause some burden for the state, the burden is not only minimal, the state shoulders it regularly. In fact, the petitions included JB's and KB's names and addresses. Given the irreversible nature of an order permitting a hospital to withdraw life support, we conclude that KB and JB were entitled to notice of the second hearing and an opportunity to participate in it as the most "rudimentary" of due process protections.[166] The denial of this notice and opportunity to be heard was a constitutional violation.

### G. CLEAR AND CONVINCING EVIDENCE

Ladd argues that "clear and convincing" is the proper evidentiary standard to apply to a decision to withdraw life support. We agree. According to *In re Martin*, when courts apply the substituted-judgment decisional standard, the proper evidentiary standard is clear and convincing.[167] In other words, "the proofs in sum must meet the exacting standard of clear and convincing evidence"[168] by demonstrating that "the patient's prior statements clearly illustrate a serious, well thought out, consistent decision to refuse treatment under these exact circumstances, or circumstances highly similar to the current situation . . . ."[169]

---

[166] See *Bundo, supra* at 696.

[167] *Martin, supra* at 225-229.

[168] *Id.* at 229.

[169] *Id.*

Because of its limited focus on a formerly competent patient, *Martin* does not resolve the evidentiary standard for a best interests determination, which applies to a patient who was never competent or had never expressed her wishes concerning medical care. However, the reasoning in *Martin* supporting the clear and convincing standard is overwhelmingly persuasive.[170] The *Martin* Court noted that the clear and convincing standard is the highest level of proof required in civil proceedings and determined that it is appropriate because it places the risk of error on the party petitioning to withdraw life support.[171] By favoring the status quo, this relatively high evidentiary standard provides an opportunity for meaningful appeal because the patient may still be alive. Therefore, we adopt the clear and convincing evidentiary standard for best interests determinations concerning withdrawing life support.

Ladd, however, claims that referee Schummer was unaware that the clear and convincing evidentiary standard applied to this best interests determination and, therefore, recommended withdrawing baby Allison's life support on the basis of inadequate evidence. Referee Schummer's comments at the second hearing and his written findings and recommendations closely match each other. In the space of one page, those written findings and recommendations briefly summarized the evidence before considering a number of factors that the *Rosebush* Court indicated were appropriate.[172] On the whole, it appears that referee Schummer recommended withdrawing baby

---

[170] See *id.* at 225-227.

[171] *Id.*

[172] See *Rosebush, supra* at 690.

Allison's life support because, in his view, the risks associated with continuing this type of medical care significantly outweighed the benefits, implicitly concluding that it was in baby Allison's best interests to withdraw her life support.

However, it is apparent to us that referee Schummer simply did not seek out sufficient information to recommend the decision to withdraw baby Allison's life support.[173] For example, Dr. Delaney-Black's testimony suggested that there was at least one other physician treating baby Allison and that she and this other physician (or physicians) agreed that baby Allison was going to die regardless of whether she remained on the ventilator and received prostaglandin. Yet, when none of the lawyers presented referee Schummer with a second medical opinion, he did not ask if one was available or why one was unnecessary. Referee Schummer did not even have a copy of baby Allison's medical record, which was submitted to the family court only in response to the motion for the review hearing in March 1999, *after* baby Allison died.

Referee Schummer clearly considered Dr. Delaney-Black's opinion incontrovertible. In reality, Dr. Delaney-Black's opinion may have been uncontroverted simply because no other physician was called to testify. Though every other physician may have agreed completely with Dr. Delaney-Black, referee Schummer apparently did not even consider the possibility that baby Allison's diagnosis and prognosis might be debatable. Nor did he ask to hear testimony from any-

---

[173] See MCR 5.923(A).

one else who had seen baby Allison or was concerned about her.

Certainly, the evidence on the record was clear. Dr. Delaney-Black's testimony directly supported referee Schummer's findings and recommendation and the ultimate "order." However, this evidence was not convincing. If baby Allison were still alive, we would remand this case to the family court for an evidentiary hearing so the family court could develop a minimally acceptable record describing baby Allison's diagnosis and prognosis as viewed by others. If that were impossible or unnecessary, the family court would have an opportunity to explain its conclusion. On the basis of this inadequate record, we simply cannot find convincing evidence to support a decision to authorize Children's Hospital to withdraw baby Allison's life support. Therefore, we conclude that this decision was clear error.

### H. JUDICIAL DECISIONMAKER

Ladd maintains that a judge, not a hearing referee, must make the decision to withdraw life support in every case. Again, we agree. MCL 712A.10 defines the scope of a hearing referee's authority, providing in relevant part:

> (1) Except as otherwise provided in subsection (2), the judge of probate may designate a probation officer or county agent to act as referee in taking the testimony of witnesses and hearing the statements of parties upon the hearing of petitions alleging that a child is within the provisions of this chapter, if there is no objection by parties in interest. The probation officer or county agent designated to act as referee shall do all of the following:

> (a) Take and subscribe the oath of office provided by the constitution.
>
> (b) Administer oaths and examine witnesses.
>
> (c) If a case requires a hearing and the taking of testimony, make a written signed report to the judge of probate containing a summary of the testimony taken and a recommendation for the court's findings and disposition.

Neither the court rules nor any statute permits a hearing referee to enter an order for any purpose. In fact, that a hearing referee must make and sign a report summarizing testimony and recommending action for a judge reveals that the Legislature specifically denied referees the authority to enter orders, no matter their substance.[174]

To paraphrase the Michigan Supreme Court in *Campbell v Evans*,[175] we do not doubt that hearing referees play an extremely valuable role in the operation of the family courts, especially when attempting to handle emergency cases. However, a hearing referee's recommendations and proposed order *cannot* be accepted without judicial examination.[176] "They are a helpful time-saving crutch and no more. The responsibility for the ultimate decision and the exercise of judicial discretion in reaching it still rests squarely upon the trial judge" and may not be delegated.[177] Consequently, when it is apparent that someone other than a judge made the substantive legal decision in a case, the only appropriate appellate response is to re-

---

[174] MCL 712A.10(1)(c).

[175] *Campbell v Evans*, 358 Mich 128, 131; 99 NW2d 341 (1959).

[176] See *id.*

[177] *Id.*; see also *Mann v Mann*, 190 Mich App 526, 538-539; 476 NW2d 439 (1991) ("The trial court also committed clear legal error in delegating to the Friend of the Court the child support determination.").

verse.[178] This holds true regardless of whether the case concerns end-of-life issues.

There is no way to demonstrate, solely on the basis of the · record, that referee Schummer actually stamped the name of the family court judge on this "order" permitting Children's Hospital to withdraw life support. However, it is reasonable to assume that he did so. Referee Schummer's statements at the close of the second hearing are redolent with an assumed *judicial* authority. Referee Schummer not only referred to himself as the "Court," he spoke on the record of his "decision" to "authorize the medical procedures . . . as requested," and the right to "appeal" that decision to a family court judge and this Court. The signature on the order is plainly from a rubber stamp, not handwritten. The signature stamp was likely affixed on the same day as the date stamp, which indicates that the order had been examined by a judge on February 18, 1999. Although the family court stated at the review hearing that it had reviewed the record, it did not state that it had reviewed referee Schummer's findings and recommendations on February 18, 1999. In fact, read closely, the family court's approval of those findings and recommendations permits us to infer that it had not reviewed referee Schummer's findings and recommendations until it was preparing to address the petition for review. This was after the "order" was "entered" in the sense that it was placed in the lower court record, representing that it was legally binding. On the whole, the scant evidence in the record supports Ladd's argu-

---

[178] The *Campbell* Court also remanded for a new hearing. *Campbell, supra* at 131. However, when no relief is available, a remand to supplement the record would be purposeless.

ment that referee Schummer acted outside his authority by "entering" the "order" permitting withdrawal of baby Allison's life support.

The FIA attempts to place the blame for baby Allison's premature death on the shoulders of the staff of Children's Hospital who withdrew her life support before the seven-day period specified in the "order" elapsed. Had the medical staff not acted so precipitously, the FIA contends, baby Allison would have been able to obtain judicial review of that "order." However, if anything, this is an additional error in this case, not an excuse for other errors. The point is not just that baby Allison was deprived of a full judicial review hearing or a rehearing before her death rendered those proceedings meaningless. Rather, she was also deprived of her right to have a family court judge *make* the most serious decision in this case—a decision that ended her life—in the first instance.

Nor did the review hearing make the "order" withdrawing baby Allison's life support legally valid. A review hearing under MCR 5.991 presupposes that an order *has not* been entered dealing with the subject of the hearing over which a referee presided. Rather, as MCR 5.991(A) and (E) suggest, the review hearing is intended to allow a judge to determine whether to "affirm, modify, or deny the *recommendation* of the referee in whole or in part" in a resulting order.[179] Even if MCR 5.991 effectively permitted the family court to hold review hearings to make an order valid by approving it retroactively,[180] the family court did

---

[179] Emphasis added.

[180] See *Mann, supra* at 529-530.

not attempt to do so in this case. The family court did not endorse the "order" at the review hearing in the sense that it made any representation that it had reviewed referee Schummer's findings and recommendations, that it had personally signed and entered the "order," or that it was somehow taking responsibility for the "order" one month after its supposed entry. In reality, the review hearing in this case was more like a rehearing under MCR 5.992, in which a "judge may affirm, modify, or vacate *the decision previously made* in whole or in part . . . ."[181] However, there was no valid decision to *re*hear.

The court rules and statutes prescribing procedures for protective proceedings are not just technical obstacles that may be discarded in the name of expediency or even in the understandable rush to protect a child. Rather, taken together, the statutes and court rules reflect standards that are essential to the administration of justice. The statutes and court rules make the proper procedures in a protective proceeding clear. It should be equally clear that they must be followed. Thus, we conclude, the way the "order" was entered following the second hearing constituted independent error requiring reversal because of this significant deviation from MCL 712A.10.

### XIII. COUNSEL

#### A. LADD'S ARGUMENT

Ladd raises several arguments concerning baby Allison's right to counsel. First, he maintains that baby Allison's right to counsel imposed substantive

---

[181] MCR 5.992(D) (emphasis added).

obligations on her attorneys. Second, he claims that his participation in the first hearing constituted a formal appearance as baby Allison's attorney under the court rules. Third, he contends that his failure to file a written appearance did not excuse the FIA and the family court from giving him notice of the second hearing. Fourth, he argues that substituting Mahinske was improper without a determination on the record that there was good cause to substitute counsel. Fifth, he asserts that Mahinske failed to act effectively on behalf of AMB as she was required to do.

Some of Ladd's individual counsel issues do not relate directly to whether Mahinske rendered effective assistance of counsel, his centerpiece argument. Nevertheless, examining the procedures that apply to counsel for a minor child in a protective proceeding illustrates the nature of an attorney's obligation to a minor child. Viewed broadly, the question we must consider is what, or how much, a minor child can expect of the attorney appointed to represent the child in a protective proceeding. Narrowly, the question we must address is whether baby Allison was afforded the representation to which she was entitled.

B. RIGHT TO EFFECTIVE COUNSEL

The Sixth Amendment right to counsel and the analogous state right to counsel articulated in Const 1963, art 1, § 20 do not apply directly to child protective proceedings because these proceedings are civil, not criminal, in nature.[182] Although certain elements

---

[182] See *In re EP*, 234 Mich App 582, 597; 595 NW2d 167 (1999), overruled on other grounds by *In re Trejo Minors*, 462 Mich 341, 353, n 10; 612 NW2d 407 (2000).

of a criminal defendant's rights to an effective attorney apply in child protective proceedings, the right to counsel in a protective proceeding is statutory, not constitutional.[183]

Published case law pays little attention to a child's right to counsel in a protective proceeding. However, this Court has held that a child's right to counsel is the right to "zealous advocacy" under MCL 712A.17c(7), as well as the analogous court rule, MCR 5.915(B)(2).[184] In fact, both MCL 712A.17c(7) and MCR 5.915(B)(2) provide basic information about the obligations an attorney has to a minor child who is her client.

In February 1999, MCL 712A.17c(7)[185] stated, in pertinent part:

> The appointed attorney shall observe and, dependent upon the child's age and capability, interview the child. If the child is placed in foster care, the attorney shall, before representing the child in each subsequent proceeding or hearing, review the agency case file and consult with the foster parents and the caseworker. The child's attorney shall be present at all hearings concerning the child and shall not substitute counsel unless the court approves.

The plain language of this provision imposed duties on an attorney to investigate and consult. Even performing these duties in a minimal manner would have allowed an attorney to learn (1) the circumstances that led to the protective proceeding, (2) what a child who was capable of communicating viewed as her needs, (3) what the adults involved in the case

---

[183] *EP, supra* at 598.

[184] *Shaffer, supra* at 433; see also *id.* at 434, 436.

[185] See 1997 PA 169.

viewed as the child's needs, and (4) what services were being provided for the child to address those needs. Implicit in this legislative directive was a requirement that an attorney act on this information so that the family court orders the care a child needs. Had the Legislature not intended to impose on attorneys the obligation to act on behalf of a minor client, the Legislature would not have required the attorney to appear at the hearings. MCR 5.915(B)(2) also reflects a child's right to a competent attorney and is substantively similar to MCL 712A.17c, as it appeared in February 1999.

The Child Protection Law, MCL 722.621 *et seq.*, which requires legal representation for children who are involved in court proceedings because of abuse or neglect, is also instructive. When this case was pending in February 1999, MCL 722.630[186] enumerated more specific duties for an attorney appointed under the Child Protection Law. At that time MCL 722.630 stated:

> The court, in every case filed under this act in which judicial proceedings are necessary, shall appoint legal counsel to represent the child. The legal counsel, in general, shall be charged with the representation of the child's best interests. To that end, the attorney shall make further investigation as he deems necessary to ascertain the facts, interview witnesses, examine witnesses in both the adjudicatory and dispositional hearings, make recommendations to the court, and participate in the proceedings to competently represent the child.

MCL 722.630 went beyond MCL 712A.17c(7) and the analogous court rule by prescribing the standard that

---

[186] See 1975 PA 238, § 10.

must guide the attorney's representation and the need to investigate, use professional judgment, and participate in proceedings in both an active and competent manner. Yet, this version of MCL 722.630 clearly referred to the protective proceeding that can be instituted following a report under the Child Protection Law. Plainly, then, the duties of a lawyer in a case stemming from a report of child abuse or neglect are the duties of all lawyers representing children in protective proceedings. In fact, the Child Protection Law, MCL 722.622(a), defines an "attorney" by referring to the obligations of an attorney as described in the Juvenile Code, MCL 712A.13a.[187] Thus, though MCL 712A.17c(7) as in effect in February 1999 did not describe an attorney's duties in great detail, MCL 722.630 illustrated those duties.

In both the Child Protection Law and the Juvenile Code, the Legislature made clear that a child's attorney has the same duties that any other client's attorney would fulfill when necessary.[188] Those duties, such as the duty to investigate, examine witnesses, and appear at hearings on behalf of the client, are inherent in each attorney's ethical obligations. For instance, MRPC 1.1 mandates that "[a] lawyer shall provide competent representation to a client." Subsection b of that rule prohibits a lawyer from

---

[187] That MCL 722.630 and MCL 712A.17c(7) were amended at the same time to incorporate the new lawyer-guardian ad litem standards under MCL 712A.17d and that both amendments became effective March 1, 1999, indicates that the attorneys appointed under either of these statutes had identical, substantive duties. See 1998 PA 480; 1998 PA 483.

[188] Again, MCL 712A.17d changed the relationship between a child and the child's lawyer for cases after March 1, 1999. However, though this discussion of an attorney's duties might be of limited benefit in future cases, it is necessary to set a foundation for analyzing Ladd's claim that Mahinske was ineffective.

"handl[ing] a legal matter without preparation ade-
quate in the circumstances." As the comment follow-
ing MRPC 1.1 relates:

> Competent handling of a particular matter includes
> inquiry into and analysis of the factual and legal elements
> of the problem, and use of methods and procedures meet-
> ing the standards of competent practitioners. It also
> includes adequate preparation. The required attention and
> preparation are determined in part by what is at stake;
> major litigation and complex transactions ordinarily require
> more elaborate treatment than matters of lesser con-
> sequence.

Even in high stakes cases with a great deal of
urgency, attorneys have specific ethical obligations.
The comments following MRPC 1.1 further explain:

> In an emergency, a lawyer may give advice or assistance
> in a matter in which the lawyer does not have the skill ordi-
> narily required where referral to or consultation or associa-
> tion with another lawyer would be impractical. *Even in an
> emergency, however, assistance should be limited to that
> reasonably necessary in the circumstances, for ill-
> considered action under emergency conditions can jeop-
> ardize the client's interest.*[189]

Thus, lawyers have duties to their clients that may
transcend the minimum standards of conduct that the
Legislature imposes in a statute. Clients, whether chil-
dren or adults, have the right to expect their attorney
will perform these duties. Indeed, the right to an
attorney would be meaningless if a minor child who
is the subject of a proceeding that can change—or
end—her life could not expect that the attorney rep-
resenting her will do so effectively.

---

[189] Emphasis added.

Case law does not prescribe standards to determine whether a child was denied the effective assistance of counsel. There is a conceptual misfit between the defective performance and prejudice test[190] for ineffective assistance of counsel claims in criminal cases and the question of effective assistance to a child in a protective proceeding. Unlike the defendant and prosecutor in a criminal proceeding, a child and the petitioner in a protective proceeding do not always have adverse interests. When a child's attorney performs inadequately, the petitioner may still protect the child's interests, eliminating any prejudice to the child.

In our view, the best analysis of a child's right to effective assistance under the system of representation in place before March 1, 1999, requires determining whether the attorney's conduct complied with the applicable statutes,[191] court rules, rules of professional conduct, and any logically relevant case law.[192] To merit relief, there must be evidence that the defective representation led to an outcome that was not clearly in the child's best interests. This adaptation of the traditional test for ineffective assistance of counsel is fitted to the special purpose of a protective proceeding:[193] acting in the child's best interests.

---

[190] See *People v Pickens*, 446 Mich 298, 303; 521 NW2d 797 (1994).

[191] The new statutory standards that apply to a lawyer-guardian ad litem articulate many basic requirements that, though not germane in this case, will be relevant to determining whether an attorney is performing adequately in future cases. 1998 PA 480, MCL 712A.17d.

[192] *EP, supra* at 598.

[193] We are not, in any way, attempting to define the scope of or test for a respondent's right to effective assistance of counsel in a protective proceeding.

If there is proof that a child was denied her right to effective assistance of counsel, the critical issue then becomes determining the appropriate remedy. In *Shaffer,* having determined that the children were denied the effective assistance of counsel, this Court remanded the case for further proceedings, essentially reinstituting the protective proceeding despite the probate court's decision to return the children to their mother.[194] Though we have no relief to offer baby Allison, *Shaffer* implies that the full panoply of necessary remedies are available to a child denied the effective assistance of counsel in a protective proceeding.

### C. APPEARANCE AND NOTICE

Ladd's contention that his appearance in the family court at the first hearing constituted a formal appearance is part of an indirect challenge to the way referee Schummer ensured—or failed to ensure—that baby Allison was represented by competent counsel at the second hearing. Ladd apparently contends that failing to give him notice of the hearing, to which he was entitled under MCR 5.921(B)(1)(c), functionally deprived baby Allison of adequate representation. This claim that he formally appeared is calculated to contradict the FIA's argument that he was not baby Allison's lawyer at the second hearing.

MCR 5.915(C) states that "[t]he appearance of an attorney is governed by MCR 2.117(B)." MCR 2.117(B), in turn, prescribes in relevant part:

---

[194] See *Shaffer, supra* at 430, 437.

(1) *In General.* An attorney may appear by an act indicating that the attorney represents a party in the action. An appearance by an attorney for a party is deemed an appearance by the party. Unless a particular rule indicates otherwise, any act required to be performed by a party may be performed by the attorney representing the party.

(2) *Notice of Appearance.*

(a) If an appearance is made in a manner not involving the filing of a paper with the court, the attorney must promptly file a written appearance and serve it on the parties entitled to service. The attorney's address and telephone number must be included in the appearance.

(b) If an attorney files an appearance, but takes no other action toward prosecution or defense of the action, the appearance entitles the attorney to service of pleadings and papers as provided by MCR 2.107(A).

According to MCR 5.915(E), an attorney who is appointed by the court to represent a party remains the client's attorney "until discharged by the court."[195] Having not been "discharged" by the family court at any time in these proceedings, Ladd was baby Allison's attorney at all times in this case.[196] This entitled Ladd to notice of other proceedings.[197]

Ladd does not contend that he actually filed a written appearance before the second hearing, which occurred on February 17, 1999. Yet, it is not clear whether this was a failure to comply with the filing requirement in MCR 2.117(B)(2)(a). Though MCR 2.117(B)(2)(a) required Ladd to file a written appearance with the family court "promptly," the court rule

---

[195] Though an order appointing an attorney for a child may constitute an appearance, no order specifically appointing Ladd to represent baby Allison exists in the record in this case.

[196] MCR 5.915(E).

[197] MCR 5.920(F).

neither defines promptness nor penalizes a failure to file a written appearance "promptly."

The FIA attempts to justify its failure to give notice to Ladd by noting that referee Schummer had not presided at the first hearing and did not know that Ladd represented baby Allison. However, when referee Schummer commenced the second hearing, Mahinske stated that she was appearing for baby Allison as "emergency house counsel." This was sufficient to inform referee Schummer that Mahinske was not the attorney originally appointed to represent baby Allison and to prompt him to inquire into Ladd's whereabouts.[198] If that information did not appear in the record or if Mahinske did not know that Ladd was baby Allison's attorney, Matlock, who was at the first hearing, could have revealed that Ladd had already appeared. If Matlock did not know Ladd's name, the assistant attorney general representing the FIA at the second hearing should have had that information.[199] In short, there were ways to determine who was representing baby Allison in this case, but no one involved in the second hearing attempted to do so. Consequently, referee Schummer did not "ensure" that Ladd, who was entitled to notice, actually received notice of the hearing or that there were any circumstances that would have excused notice to him.[200] This was error.

---

[198] See MCR 5.915(B)(2)(a).

[199] See, generally, *People v Fountain*, 407 Mich 96, 99; 282 NW2d 168 (1979) (courts presume that attorneys from the same office have the same information).

[200] MCR 5.921(B)(1).

### D. MAHINSKE'S SUBSTITUTION

We know of no absolute requirement that the same attorney represent a child throughout a protective proceeding. In fact, there may be good reasons not to require that an attorney appointed on the spot to represent a child at a preliminary hearing continue to represent the child in the rest of the protective proceeding. However, when read together, MCR 5.915(B)(2)(a), the attorney appearance rule, and MCR 5.915(E), the attorney discharge rule, demonstrate a policy that favors consistent legal representation when possible, thereby disfavoring attorney substitutions. Not surprisingly, then, MCR 5.915(B)(2)(d) provides:

> The court may permit another attorney to temporarily substitute for the child's attorney at a hearing, if that would prevent the hearing from being adjourned, or for other good cause. An attorney who temporarily substitutes for the child's attorney must be familiarized with the case and, for hearings other than a preliminary hearing or emergency removal hearing, must review the agency case file and consult` with the foster parents and caseworker prior to the hearing unless the child's attorney has done so and communicated that information to the substitute attorney. The court shall inquire on the record whether the attorneys have complied with the requirements of this subrule.

The word "shall" makes the court's inquiry into the temporary substitute's readiness mandatory.[201] There is no basis to presume that the Supreme Court intended for this to be an empty inquiry. If the substitute attorney is not prepared to proceed, there would

---

[201] See *Scarsella v Pollak*, 232 Mich App 61, 64; 591 NW2d 257 (1998), affirmed and adopted 461 Mich 547, 549; 607 NW2d 711 (2000).

be good cause for an adjournment under MCR
5.923(G)(2).

Referee Schummer knew, or should have known,
that Mahinske was not baby Allison's appointed coun-
sel but he did not ask Mahinske on the record about
her preparation. He did not even ask a pro forma,
"Ready?" of the attorneys. Referee Schummer plainly
failed to comply with MCR 5.915(B)(2)(d). Whether
Mahinske was prepared to represent baby Allison or
whether she failed to bring to referee Schummer's
attention the fact that she was not prepared does not,
under the language of this court rule, excuse referee
Schummer's failure to make this inquiry. This inquiry
is designed to ensure that the court, in this case ref-
eree Schummer, is aware of whether the attorney rep-
resenting the child is prepared to proceed. As protec-
tion for the child, MCR 5.915(B)(2)(d) acknowledges
that many children do not attend protective proceed-
ings, nor do they have the capacity, maturity, experi-
ence, or schooling to understand when an attorney is
failing to represent their interests adequately. It is
therefore incumbent on the court to make this
inquiry.

While a failure to conduct this inquiry would be
rendered harmless if the child nevertheless received
effective representation, our analysis indicates that
Mahinske did not act effectively under the circum-
stances. Thus, under the specific facts of this case,
referee Schummer's failure to conduct this inquiry
constituted error requiring reversal.

### E. MAHINSKE'S PREPARATION AND PERFORMANCE

The criminal case law concerning effective assis-
tance of counsel indicates that, absent an evidentiary

hearing, only errors that plainly exist on the record can demonstrate ineffectiveness that violates the right to counsel.[202] Although we might remand this case for an evidentiary hearing to clarify a number of issues related to Mahinske's representation, remand would only waste scarce judicial resources because there is no remedy for baby Allison. Thus, we examine the record to determine whether Mahinske performed defectively and whether any such ineffectiveness prejudiced baby Allison by leading to a result that was not in her best interests.

Ladd recites a litany of acts that he claims demonstrates Mahinske's performance was ineffective. In fact, an attorney can be ineffective for failing to investigate a case, prepare for a proceeding, call and examine witnesses, present a legal argument, object to improper testimony, or myriad other actions if they are sufficiently prejudicial.[203] In this case, we agree that Mahinske's failure to ask for a continuance or otherwise demonstrate on the record that she was prepared to represent baby Allison was deficient performance. The record does not reveal whether Mahinske was "familiarized with the case," had "review[ed] the agency case file and consult[ed] with the . . . caseworker prior to the hearing," determined that "the child's attorney ha[d already] done so," or whether Ladd conveyed that information to her.[204] We can assume that Ladd had not communicated any

---

[202] See *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996).

[203] See, generally, *People v Snider*, 239 Mich App 393, 424; 608 NW2d 502 (2000); *In re Ayres*, 239 Mich App 8, 21-22; 608 NW2d 132 (1999); *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999); *People v Truong (After Remand)*, 218 Mich App 325, 338-339; 553 NW2d 692 (1996); *People v Julian*, 171 Mich App 153, 158-159; 429 NW2d 615 (1988).

[204] MCR 5.915(B)(2)(d).

necessary information to Mahinske in time for the second hearing, because he did not learn about that hearing until after it had occurred. Though courts traditionally presume an attorney acted effectively absent compelling evidence to the contrary,[205] the tone of Mahinske's capitulation to the FIA's request for authorization to withdraw baby Allison's life support and her failure to question Matlock suggest that whatever preparation she undertook was not adequate. Minimally, Mahinske should have asked for a continuance to prepare.

Even, however, if Mahinske technically complied with MCR 5.915(B)(2)(d) by doing some preparation for the second hearing, she had no meaningful knowledge of what her obligations to baby Allison meant in practice. For instance, Mahinske did not have an absolute duty to arrange for Dr. Delaney-Black to testify in person.[206] However, Mahinske had an obligation to investigate whether she could rely on Dr. Delaney-Black's testimony as wholly authoritative. In other words, even if Mahinske did not or could not secure a second opinion from an independent physician, she should have developed the record so that it reflected why the family court could trust Dr. Delaney-Black's testimony completely.

The FIA claims that Ladd is not entitled to raise this effective assistance of counsel issue because he was also ineffective during the family court proceedings. This is nonsense. In essence, the FIA argues that two incompetent attorneys somehow negate each other's allegedly harmful effects on their client. The FIA has not provided any authority to support this argument,

---

[205] See *People v Williams*, 240 Mich App 316, 331; 614 NW2d 647 (2000).
[206] MCR 5.923(E).

and, not surprisingly, we have found none. Baby Allison was entitled to an attorney who would represent her competently. In light of her inadequate preparation and her acquiescence in the decision to withdraw life support without *convincing* evidence, we conclude that Mahinske's representation was ineffective.

XIV. LOCAL COURT RULE

Ladd claims that the order permitting the staff of Children's Hospital to end baby Allison's life support was invalid because referee Schummer relied on an unapproved local court rule permitting "medical authorization" petitions. As Ladd points out, in *Schlender v Schlender*,[207] this Court reversed a trial court's order denying a motion for a change in child custody after concluding that the trial court had improperly denied the movant an evidentiary hearing pursuant to a local court rule that the Supreme Court had not approved.

The problem with applying *Schlender* to this case is there is absolutely no evidence of a local court rule or administrative policy guiding the proceedings. Though the record includes a number of references to a petition for "medical authorization," Ladd has not provided the Court with a copy of any local court rule or policy in effect in February 1999, much less one that purports to allow or control petitions seeking permission for medical treatment. Though the FIA has submitted a copy of the Third Judicial Circuit's case management rule C.9 dated June 13, 2000, entitled

---

[207] *Schlender v Schlender*, 235 Mich App 230, 232-234; 596 NW2d 643 (1999); see also MCR 8.112.

"Protective Proceedings: Hospitalizations and Medical Authorizations," there is no evidence that the procedures outlined in it were in effect in February 1999. In fact, the family court's comments at the end of the review hearing that "a review of the procedure will take place and an administrative order will be issued by this Court for future cases" suggests that there were no specific procedures in place for dealing with this sort of case. Accordingly, we cannot conclude that a local court rule guided the proceedings in this case, irrespective of whether the Supreme Court approved it.

XV. "HARMLESS" ERROR

There can be little question that the string of errors in this case affected baby Allison's substantial rights and cast doubt on the fundamental fairness of the proceedings. In another case, some of the procedural errors, such as referee Schummer's failure to inquire whether Mahinske was prepared to represent baby Allison, might not require reversal. However, given that each of these errors contributed to the decision to withdraw baby Allison's life support without convincing evidence that doing so was in her best interests, the accumulation of errors in this case cannot, by definition, be considered harmless.

XVI. CONCLUSION

General Charles de Gaulle's daughter, Anne, was born retarded.[208] She was unable to feed or clothe

---

[208] Fadiman & Bernard, *Bartlett's Book of Anecdotes* (Boston: Little, Brown, & Co, 2000), p 160.

herself, or speak well.[209] De Gaulle was a notoriously aristocratic and aloof man, but for all his daughter's life he spent hours "playing simple games with her and at night he would hold her hand until she fell asleep."[210] In 1948, Anne died after she contracted a lung ailment.[211] At his daughter's funeral, de Gaulle turned to his wife and said, "Now at last our child is just like all children."[212]

It almost certainly did not occur to Charles de Gaulle that his daughter should be put to death for her disabilities. We again observe that we can fashion no remedy that will unmake the decisions that led to baby Allison's death; now she is, in the true meaning of de Gaulle's heartbreaking phrase, just like all children. Moreover, we do not hold that life support can never be withheld or removed from a desperately ill and suffering child, although we acknowledge that linking the removal of life support to the child's best interests is, on the surface, enormously jarring.

We emphasize, instead, that the judicial branch is almost entirely reactive. Courts respond only to matters that are brought before them, taking cases as they exist: troubling facts, imperfect records, and all. This is but one of many reasons why the decision to withdraw life-sustaining medical care from a desperately ill child is one that should rarely involve the courts. As *Rosebush*, still a seminal case in Michigan jurisprudence concerning the subject of end-of-life decisions, aptly put it: "[T]he decision-making process should generally occur in the clinical setting without

---

[209] *Id.* ·

[210] *Id.*

[211] *Id.*

[212] *Id.*

resort to the courts, but . . . courts should be available to assist in decision making when an impasse is reached."[213]

Here, the family court did not become involved because an impasse existed. Rather, in the final analysis, the family court became involved because the state, through the FIA, apparently took it upon itself to assume the mantle of responsibility to act as baby Allison's surrogate. While asking the family court simply to decide what was in baby Allison's best interests, the FIA directly pressed for an order authorizing Children's Hospital to remove her life support. This ran exactly contrary to the warning in *Rosebush* that judicial involvement in such a decision is unwarranted other than as a last resort. Notably, this warning extends not merely to the courts that must, in the most extreme cases, assist in resolving impasses, but also to those, like the FIA, who bring these cases to the courts' attention.

Moreover, in the accelerating rush to judgment that occurred here, the series of legal errors and missteps following the preliminary hearing compounded what was already an excruciatingly difficult and complex situation. The record strongly suggests that no one involved in the protective proceeding had ever communicated directly with baby Allison's parents and that only Dr. Delaney-Black had ever seen baby Allison. Thus, a statutory process designed to protect individual rights, to allow the intelligent exercise of these rights, and to assure balanced and considered decision making became, instead, the opposite. This indicates such a relentless disregard for basic princi-

---

[213] *Rosebush, supra* at 683.

ples that in this opinion we have attempted to assure that this tragedy—and a tragedy it was, in every sense of the word—is never repeated in our state.

Reversed.

Collins, J., concurred.

McDonald, J., did not participate.

### APPENDIX A

#### SUMMARY OF HOLDINGS

In a protective proceeding, a family court's subject-matter jurisdiction depends solely on whether the petition alleges facts that fit within MCL 712A.2(b) and are not merely frivolous. A family court does not lose subject-matter jurisdiction in a protective proceeding solely because a serious medical decision must be made, including whether to withdraw life support. Neither CAPTA nor EMTALA specifically prohibits a family court from considering whether to withdraw life support. Though discrimination in judicial proceedings may give rise to a due process or equal protection argument that may be asserted on appeal, the ADA and the PWDCRA may not be used to challenge a family court decision when neither act was at issue in the family court.

The family court must comply with the notice requirements in MCR 5.920 and MCR 5.921 to establish personal jurisdiction over respondents. As critical as personal jurisdiction is, the right to notice is personal and cannot be challenged on appeal by anyone other than the person deprived of notice. Aside from the statutory right to notice, ordinary procedural due process principles determine whether the family

court can hold a hearing without offering notice and an opportunity to be heard to individuals whose interests are affected.

MCL 712A.18f(4) does not permit the family court to enter a dispositional order of any sort before it properly finds that the child comes within its jurisdiction pursuant to MCL 712A.2(b). However, if the family court places the child in out-of-home care, MCL 722.124a(1) permits a family court to order routine, nonsurgical medical care or emergency medical or surgical treatment even before holding an adjudication on the petition. This statute grants a family court the authority to enter an order allowing medical personnel to withdraw life support from a minor child if the medical or surgical care ceases to be treatment. However, the family court must make every possible effort to respect the policy disfavoring judicial intervention in a life support decision by holding an adjudication before making that decision.

When considering whether to withdraw life support, the family court must first determine whether the minor child is of an age and maturity to make her own decision concerning her treatment. If the child is old enough and mature enough, even though still a minor, she has the right to refuse treatment as the corollary to the right to give informed consent. If the child is not competent to make such a decision for herself, the court must consider whether the child was once competent to make this decision. If the child was once competent and there is clear and convincing evidence that she had expressed an intent to refuse the treatment at issue under the circumstances, then the family court must enforce her choice under the substituted-judgment decisional

standard. If the child was never competent or had not expressed any wishes concerning treatment under the circumstances, the family court must examine what is in the child's best interests. The family court must have clear and convincing evidence under either the substituted-judgment or best interests standard in order to withdraw life support.

As the family court is considering the child's competence, it should also determine whether to appoint a guardian ad litem for the child unless the current statutory scheme provides otherwise. Though a lawyer appointed to represent the child in proceedings before March 1, 1999, may have also served as a guardian ad litem, the family court should have considered whether the circumstances warranted appointing a different individual as the guardian ad litem.

In cases before and after March 1, 1999, if a parent or other surrogate who would ordinarily make a medical decision for the child is allegedly incompetent, the family court must have clear and convincing evidence of that person's incompetence before depriving that person of the opportunity to make the life support decision. There is no presumption of incompetency in this context. Other good reasons may also exist to justify depriving a parent or other surrogate of the opportunity to make the life support decision.

If a case calls for a best interests determination, the family court must consider all relevant factors as outlined in *Rosebush*. Additionally, the family court may weigh the presence or absence of medical consensus, the factors that contributed to medical disagreement or agreement, and the factors that make

any independent physician opinion more or less relevant to the ultimate decision to withdraw life support.

No matter the value of informal practice in the family courts, strict adherence to the statute and court rules is the only acceptable choice in cases involving withdrawal of life support. MCL 712A.10 permits a referee to conduct a hearing relevant to a request to withdraw life support. However, the referee must make written findings and recommendations to submit to a judge. MCR 5.991 then grants the parties seven days in which to request full judicial review. If the circumstances in a case require immediate action, then the parties and the family court may agree to have a judge hear the case immediately, stipulate the facts, or take other steps to expedite the proceedings. After the review process, or even if there is no request for judicial review, a judge must make the decision, in fact and not merely in form, and must then personally sign any order.

Throughout a proceeding under the Juvenile Code, a child has the right to an attorney who is her zealous advocate. MCR 5.915 and MCL 712A.17c(7), as well as MCL 712A.17d and MCL 712A.13a(1)(b) for cases after March 1, 1999, impose substantive obligations on the child's attorney. MCL 722.630, relevant case law, and the rules of professional conduct are also helpful in defining an attorney's obligations. The court rules disfavor substituting attorneys for a child when at all possible. However, when it is necessary to provide a temporary substitute for the child's attorney, the family court plays an important role in ensuring that this attorney is prepared to render zealous advocacy by engaging in the inquiry prescribed in MCR 5.915(B)(2)(d). Courts test whether a child was

denied the effective assistance of counsel in a case under the system in place before March 1, 1999, by examining whether the child's attorney's conduct departed from these substantive obligations and whether that deficient performance led to an outcome that was not in the child's best interests. If the attorney was ineffective, the reviewing court may order appropriate relief, including reinstituting protective proceedings if necessary.

APPENDIX B

| Issues in the application for leave to appeal to the Michigan Supreme Court addressed in this opinion | Opinion references |
|---|---|
| **Issue iv**: Where the child was never adjudicated a temporary ward of the court, she had the standing to raise all the issues before the court, including those which specifically effected [sic] the parent(s). | Section VI *Ante* at 173-176. |
| **Issue v**: The family division of the circuit court did not have subject-matter or personal jurisdiction to authorize the withdrawal of life support in a case brought under the Juvenile Code. | Section V *Ante* at 165-173. |
| **Issue vi**: Assuming arguendo that the court did have proper jurisdiction over the parties and the subject matter, the court did not have the statutory authority to enter a dispositional order authorizing the withdrawal of life support. | Sections VII and VIII *Ante* at 176-183. |
| **Issue vii**: Regardless of whether the circuit court's family division had the authority to act in this case, that authority could not have been exercised solely by a referee of the court. | Section XII *Ante* at 197-220. |
| **Issue viii**: Regardless of any jurisdictional infirmities the parties and the court ignored remedies and procedures that were available under statutes and case law. | Section XII *Ante* at 197-220. |
| **Issue ix**: The child was denied her statutorily mandated right to counsel where the referee held a hearing without her court-appointed attorney and instead held a hearing on the withdrawal of life support with an "emergency house counsel" who did not fulfill her statutory or legal duties. | Section XIII *Ante* at 220-234. |
| **Issue x**: The referee violated a number of federal and state statutes directed at the protection of children, seriously ill individuals, and the disabled where he precipitously ordered the withdrawal of life support and medication from the child. | Sections IX, X, and XI *Ante* at 183-197. |
| **Issue xi**: Where the primary issues before the court were whether or not to withdraw life-sustaining medical treatment and whether the mother was capable of consenting to medical treatment or its withdrawal, the lack of legally admissible evidence was clear error. | Section XII *Ante* at 197-220. |